**BEARD–LANEY, Inc. v. UNITED STATES et al.**

**Civ. No. 2048.**

United States District Court
E. D. South Carolina.
March 10, 1949.

Frank A. Graham and E. W. Mullins, both of Columbia, S. C., for plaintiff.

Allen Crenshaw, of Birmingham, Ala., Attorney, Ben Scott Whaley, U. S. Atty., of Charleston, S. C., Edward M. Reidy, Asst. Chief Counsel, of Washington, D. C., for Interstate Commerce Commission, William D. McFarlane, Sp. Asst. to Atty. Gen. and Herbert A. Bergson, Asst. Atty. Gen., for the United States.

L. A. Odom, of Spartanburg, S. C., C. W. Tillett, Jr., of Charlotte, N. C., Frank J. Bostick, of Spartanburg, S. C., and Joseph H. Blackshear, of Gainesville, Ga., for Associated Petroleum Carriers.

Before PARKER, Circuit Judge, and WYCHE and TIMMERMAN, District Judges.

PARKER, Circuit Judge.

This is a suit to set aside and enjoin an order of the Interstate Commerce Commission granting to Associated Petroleum Carriers a certificate of public convenience and necessity to operate as a common carrier by motor vehicle, in interstate or foreign commerce, of petroleum products, in bulk in tank trucks over irregular routes, from Wilmington, Fayetteville, Morehead City and New Bern, N. C., Charleston, S. C., Savannah, Ga., and terminals in Georgia, North Carolina and South Carolina on the pipe lines of the Southeastern Pipe Line Company and the Plantation Pipe Line Company to all points in Georgia, North Carolina and South Carolina. A special court of three judges had been convened pursuant to statute, 28 U.S.C.A. §§ 2284(1) and 2325, to hear the application for interlocutory injunction, the case has been heard upon the pleadings and record made before the Commission and the briefs and arguments of counsel, and by consent of parties the cause has been submitted upon the merits for final decree.

The application of the Associated Petroleum Carriers, hereafter referred to as the applicant, stems from and is to supersede an operation conducted under temporary authority granted by the Commission on June 2, 1942, to the War Emergency Cooperative Association, hereafter referred to as WECA, to transport petroleum products in bulk in tank trucks between points in North Carolina, South Carolina, Georgia and Florida. WECA was organized at the request or suggestion of the Office of Defense Transportation and under its sponsorship. It was an association of former private carriers domiciled in North Carolina, South Carolina and Georgia, some of whom were jobbers or distributors of petroleum products and others were operating as contract carriers under state authority. They hauled petroleum products from the ports and pipe line outlets to consumers and distributors in the territory served, using approximately 148 petroleum carrying motor vehicles in the service. Applicant proposed to acquire this equipment and to carry on the business which had been handled by WECA. Its application was opposed by fourteen motor carriers operating within the three states named and by the southern rail carriers. Only one of these protestants, however, has come into court asking that the action of the Commission be enjoined. This protestant is Beard-Laney, Inc., which has a license to transport from only seven of the twenty-six points of origin within the territory.

The application for the certificate of convenience and necessity was filed in August 1945, and was referred to a Joint Board, pursuant to section 205 of the Interstate Commerce Act as amended, 49 U.S.C.A. § 305, composed of representatives chosen from the Public Service Commissions of North Carolina, South Carolina and Georgia. After a full hearing this Joint Board filed a comprehensive report on April 8, 1946, finding the facts in meticulous detail and recommending that the application for a certificate of convenience and necessity for operation in interstate commerce within the designated territory be granted. After setting forth the facts showing the need of the service which applicant proposed to render, the Joint Board replied to the contention that the granting of the application

would result in diverting traffic from protestants in the following language:

"Protestants overlook the fact that the presently authorized carriers are not in a position to render the service proposed by applicant. A few are contract carriers who render a specialized service under individual contracts and agreements, are not required to serve the public, and may pick and choose among shippers. A shipper is entitled to dependable motor carrier service which is not subject to the contingency of negotiating a satisfactory agreement for contract carriage or the burden of assuming the obligations of such a relationship. Rayfield Contract Carrier Application, 21 M.C.C. 214.

"In the past, applicant's predecessor, WECA, and the protestants have been operating within the southeast, some under temporary authority. There has been no showing that any common carrier has suffered substantial loss of revenue or its service has been impaired by reason of the present competitive situation. There has been no complaint by any shipper witness that the service performed by any common carrier protestant has been rendered inadequate, but on the contrary, the record is replete with statements to the effect that protestants gave prompt and efficient service. The granting of the instant application is merely a substitution of applicant for WECA. The status quo of the service and the territorial scope of the operation for all practical purposes is to be maintained. Despite this, protestants would have the Joint Board believe that the proposed operation would create unfair and destructive competition. The evidence will not support such a finding.

"The Joint Board is convinced that the grant of authority to applicant, paralleling, in some instances, that of other common carriers will result in a healthy competitive situation and will tend to foster sound economic conditions in the transportation industry.

\*　\*　\*　\*　\*　\*

"Here is a motor carrier operation conceived during a period of dire necessity and for the purpose of meeting that need. It is now being carried on under temporary authority and because of changed condi-

tions brought about partly, at least, by that emergency, is proposed for the future. An attempt is being made by this applicant to harvest the fruits of endeavor and business acumen and to preserve for the people in the southeast, a transportation system which through the trying years of the war, has reached a high degree of perfection. Authority is sought to continue a service to which the shipping public has grown accustomed and which will utilize equipment heretofore owned and operated by private carriers and used in the transportation of their own commodities. Moreover, the service will be subject to the regulatory powers of the Federal government and insofar as intrastate commerce is concerned to the regulatory powers of the respective state governments, the advantages of which will inure to the benefit of the public as a whole."

Exceptions were filed to the recommendations of the Joint Board and the matter came on to be heard before Division 5 of the Interstate Commerce Commission, which on June 30, 1947, filed its unanimous report, finding the facts as they had been found by the Joint Board with no variations of any consequence, but holding that because 58 of the 66 stockholders of applicant were "jobbers, distributors, dealers or so called agents, engaged in buying or selling petroleum products", the granting of the application would be "inconsistent with the public interest", and also that applicant had failed to meet the burden of showing "that the proposed operation would serve a useful purpose responsive to a public demand or need, and that the public need cannot or will not be met as well by the existing carriers". Applicant filed a petition for reconsideration, which was granted; and on February 19, 1948, Division 5 filed another report upon the same evidence adopting the primary findings of fact contained in its original report, with one or two changes, but reversing itself by a vote of two to one as to the conclusions drawn therefrom. With respect to the need for the service and the adequacy of existing facilities the report said:

"In its petition applicant points out that the record fails to show any existing permanent common carrier authority to oper-

ate from many of the sources of supply to the destination territory here involved. A *reexamination of the facts in this case shows this to be true.* It will be noted from the foregoing that neither of the carriers showing a capacity for handling additional traffic is authorized to operate from Charleston, Morehead City, New Bern, Brunswick, or any of the pipe-line terminals on the Plantation pipe line except one is authorized to serve Thrift and Camp Croft, and from these latter points its service is limited to destinations in North Carolina from Camp Croft and to destinations in South Carolina from Thrift. The other carrier's permanently authorized interstate operations are entirely within Georgia, and its operations there are limited to points within 125 and 115 miles of origin.

"It is conceded by all that the consumption of petroleum products during the war was abnormal. It is open to conjecture whether postwar transportation requirements will equal or exceed those of 1940. Many witnesses in support of the application express the belief that there will be a continued increase in consumption of petroleum products by reason of conversion of heating plants in homes, hotels, and commercial establishments from coal to fuel oil, mechanization of farming equipment, increased use of fuel oil in tobacco barns and growth of the aviation industry. Protestants attempt to show that any additional traffic load that may result from increased use of petroleum products, which increase they do not concede to be a fact, can easily be handled with less transportation equipment than was necessary in 1940 due to the advent of the pipe lines, which has materially shortened the average ength of haul, and increased carrying apacity of tank trucks and trailers which are now generally in use. They furnished a traffic study which, for the reasons stated in our prior report is subject to serious question, in which they reach the conclusion that the 1946 volume of movement would require about 168 tractor-trailers.

"While protestants have shown that they are in a position to handle additional tonnage, *it should be noted that the combined total of the equipment operated by them approximated that operated by WECA at the time of the hearing.* During a six week period immediately preceding the hearing WECA transported 39,753,500 gallons or approximately 9,900 truckloads from pipe line outlets, ocean terminals, and Fayetteville. *No common carrier service is shown to be available to serve the entire territory in which a definite need for service is established by shipper witnesses, nor is it shown that existing carriers can absorb the substantial tonnage transported by WECA in the territory involved.* While the representative of one shipper stated that a need existed for service between its bulk plants located at various points in the three states, no such transportation is shown ever to have been performed by WECA nor is any definite reference made to any particular time when such service was required by the shipper. *We conclude that we erred in finding in our prior report that public convenience and necessity did not require the proposed service to the extent of operation from coast terminals, pipe line outlets, and Fayetteville, N. C., to points in the territory covered by the application.*" (Italics supplied.)

The Commission carefully weighed the matter of applicant's affiliation with the petroleum industry and the public interest thus involved in connection with the public need for the service which applicant proposed to render, saying:

"In our prior report we also found that the proposed operation, by reason of applicant's affiliation with the petroleum industry, would be inconsistent with the public interest and the national transportation policy. We adhere generally to the principles enunciated therein, but, in view of the public need for at least a part of the proposed service which has been shown, it becomes necessary to weigh again the objections to the granting of authority to applicant against the advantages accruing to the shippers and consumers through applicant's furnishing of a needed transportation service.

"Protestants contend that applicant will engage in unfair competition with existing for-hire carriers of similar commodities and that the plan of operation involves an indirect rebate, violates applicable Federal

Laws, tends to create a monopoly, lessens competition, is in restraint of trade, and that any person desiring to engage in the transportation of similar commodities in the southeast need not apply for a certificate but need only approach applicant and make a satisfactory deal without consulting this Commission. It does not appear that the present competitive relation, as it now exists between WECA and protestants, would be materially changed by applicant entering the field in place of WECA. There has been no showing that any common carrier has suffered any substantial loss of revenue or that its service has been impaired by reason of the present competitive situation. Generally speaking, there is no claim by anyone that a new service is now needed, but the record is replete with evidence that WECA has been supplying a service upon which the shipping public relies and that this service cannot be withdrawn, through denial of this application, without detriment to the shipping public. We have carefully considered each of the arguments outlined above, but find no evidence to show that applicant will be in fact, or that WECA has been, in violation of any provision of the Interstate Commerce Act or other Federal statutes or any of our rules and regulations as alleged.

"We are inclined to minimize the danger to which protestants point in establishing a precedent under which enterprising promoters might organize corporations and sell stock to persons who control traffic in other commodities such as textiles, beverages, mercantile goods, drugs, food products, and numerous other commodities. The situation in which shippers control or dominate a carrier is not novel. While it appears that other carriers may be at some competitive disadvantage, we are inclined to place more emphasis upon the supplying of an essential service than upon the possibility of injury to competing carriers. Applicant, of course, will be expected to comply strictly with the requirements of the act and our rules and regulations thereunder, and in the event of any unlawful action on its part appropriate remedies are available to aggrieved parties."

Division 5 concluded its report with a specific finding that present and future convenience and necessity require operation by applicant as a common carrier of petroleum products in interstate and foreign commerce within the territory designated. Protestants filed a petition for reconsideration; but this was denied by the Commission at a joint session, with the result that the order of Division 5, with one member dissenting, became effective as the order of the entire Commission, whereupon this suit for injunction was instituted by Beard-Laney, Inc., one of the protestants.

■ The principal position of plaintiff is that there are no adequate findings of fact upon which to base the order of the Commission and no sufficient evidence to support such findings; but we think that this position is wholly lacking in merit. The portions of the last report, which we have quoted above, are certainly sufficient, when taken in connection with the detailed findings of evidentiary facts preceding them, as findings that the service which applicant proposes to render is needed by the public, that it cannot be furnished by other carriers operating within the territory and that it will not result in destructive competition hurtful to the public interest. We may not ignore these findings because made in the form of a narrative order, rather than in separately numbered paragraphs as formerly required by Equity Rule 70½ or Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A., since these have no application to the Commission. Chicago, B. & Q. R. Co. v. United States, D.C., 60 F.Supp. 580, 584; United States v. Baltimore & O. R. Co., 293 U.S. 454, 464, 55 S.Ct. 268, 79 L.Ed. 587.

■ There can be no question that the evidence before the Commission amply supports its findings. Witness after witness testified as to the need for the service; documentary evidence shows that the operating authority of the protesting carriers is so limited that they cannot serve the territory allotted to applicant; and the fact that WECA is now handling such a large portion of the traffic is sufficient basis for the finding that the substitution of applicant in its place will not result in competition hurtful to the public interest.

We are not impressed by the argument that, because it is not shown that protestants could not increase their facilities to take care of the need which would arise upon the withdrawal of WECA, there is no basis for granting a certificate to applicant. As stated above, protestants were not authorized to render service throughout the territory; and, quite apart from this, there is nothing in law or in reason which requires that the Commission permit those already in the field to absorb the business which would be relinquished by WECA rather than give the public the benefit of the competition which would result from the licensing of applicant. We have considered what was said by Judge Schwellenbach in the case of Inland Motor Freight v. United States, D.C., 60 F.Supp. 520, but, with all respect, we are not persuaded of the correctness of the view there indicated. On the contrary, we think that for the courts to enforce any such rule in reviewing orders of the Commission is for them to misconceive their function. It is for the Commission, not the court, to say what public convenience and necessity requires and whether these will be better served by licensing an additional carrier than by permitting those already licensed to expand their facilities. As said by Mr. Justice Rutledge, speaking for the Supreme Court, in the recent case of United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821:

"The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law."

Directly in point on the question here under discussion is the case of I. C. C. v. Parker, 326 U.S. 60, 69, 65 S.Ct. 1490, 1495, 89 L.Ed. 2051, where the contention was made that there was no basis for issuing a certificate to a railroad to operate a motor line since no evidence was offered as to the inadequacy of the motor carriers then holding certificates to serve the railroad's need. In rejecting this contention, the court said:

"The contention of appellees, protestant motor carriers, is that since no evidence was offered as to the inadequacy of the presently duly certificated motor carriers to serve the railroad's need, there was a failure of proof as to convenience of and necessity for a new motor truck operation in the territory. Public convenience and necessity should be interpreted so as to secure for the Nation the broad aims of the Interstate Commerce Act of 1940. Cf. New England Divisions Case, Akron, C. & Y. R. Co. v. United States, 261 U.S. 184, 189, 43 S.Ct. 270, 273, 67 L.Ed. 605; I. C. C. v. Railway Labor Ass'n, 315 U.S. 373, 376–377, 62 S.Ct. 717, 719, 720, 86 L.Ed. 904; United States v. Lowden 308 U.S. 225, 230, 60 S.Ct. 248, 251, 84 L.Ed. 208; Texas & N. O. R. Co. v. Northside Belt R. Co. 276 U.S. 475, 479, 48 S.Ct. 361, 362, 72 L.Ed. 661. In protestant's view a certificate of convenience and necessity should not be granted to railroads for motor truck operation when existing motor carriers are capable of rendering the same service. Appellants take the position that this precise issue need not be decided in this case. They look upon the application as asking for authority to improve 'an existing service.' We think that it was for a motor service to improve an existing rail service. Consequently, the issuance of the certificate is subject to all the requirements of any other application for a certificate for operation of motor lines. Since, however, on adequate evidence the Commission found that the motor service sought was of a different character from the existing motor service and not directly competitive or unduly prejudicial to the already certificated motor carriers, 42 M.C.C. 725, 726, we hold that the Commission had statutory authority and administrative discretion to order the certificate to issue. The public is entitled to the benefits of improved

transportation. Where that improvement depends in the Commission's judgment upon a unified and limited rail-truck operation which is found not 'unduly prejudicial' to motor carrier operations, the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service."

See also United States v. Carolina Freight Carriers Corporation, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; Lang Transp. Co. v. United States, D.C., 75 F.Supp. 915, 930; A. B. & C. Motor Transp. Co. v. United States, D.C., 69 F.Supp. 166, 169; McLean Trucking Co. v. United States, D. C., 63 F.Supp. 829; Carolina Scenic Coach Lines v. United States, D.C., 56 F.Supp. 801; Id., 323 U.S. 678, 65 S.Ct. 277, 89 L. Ed. 550; Turner v. United States, D.C., 56 F.Supp. 798; Id., 323 U.S. 674, 65 S.Ct. 130, 89 L.Ed. 548; Bush Transfer v. United States, D.C., 53 F.Supp. 640; Bondurant v. United States, D.C., 50 F.Supp. 704, 706; Virginia Stage Lines v. United States, D. C., 48 F.Supp. 79; Davidson Transfer & Storage Co. v. United States, D.C., 42 F. Supp. 215, 219; Id., 317 U.S. 587, 63 S.Ct. 31, 87 L.Ed. 481. In the Bondurant case, supra [50 F.Supp. 706], the rule applicable is thus stated by another three-judge court of this Circuit, viz.:

"We cannot say that the Commission's findings are not supported by the evidence, that they involve any error of law or that they are so arbitrary or unreasonable as to amount to an abuse of discretion. This being true, the relief prayed for must be denied. 'This court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it'. Virginian Ry. Co. v. United States 272 U.S. 658, 665, 666, 47 S.Ct. 222, 225, 71 L.Ed. 463; Interstate Commerce Commission v. Union Pac. R. Co. 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308."

█ The rules to be applied in reviewing the order of the Commission are not different because that order resulted from a reversal of a prior decision of the hearing division upon a petition for rehearing. The fact that a rehearing was granted shows that the questions involved were carefully considered and the ultimate decision of the division, which received the approval of the Commission, was the final and definitive action of the Commission, which is what we are authorized to review; and it is to be reviewed in the same way and under the same limitations as other reviewable orders. We may not substitute our judgment for that of the Commission because upon a rehearing and fuller consideration of the facts it has arrived at a different conclusion from that which its hearing division had first expressed. Lang Transp. Co. v. United States, D.C., 75 F.Supp. 915, 925.

█ Plaintiff contends that the application should have been denied on the ground that it is not in the public interest that persons engaged in the sale or distribution of petroleum products have an interest as stockholders in a common carrier licensed to transport such products in interstate commerce, and that licensing a carrier where there is such stock ownership results in unfair competition tending to monopoly. This, however, is a matter to be weighed by the Commission along with other matters in determining what is required by public convenience and necessity; and the reports of the Commission show that it was given full consideration and weighed against other matters deemed of greater importance in arriving at a conclusion. In this connection it is to be noted that the prohibition of 49 U.S.C.A. § 1(8) against transporting property owned by the carrier applies only to railroads and that an effort to amend it so as to make it applicable also to motor carriers was made when the Transportation Act of 1940 was under consideration by Congress but was abandoned. See United States v. South Buffalo R. Co., 333 U.S. 771, 776, 790, and note 10 on page 790, 68 S.Ct. 868. There is nothing in the law, therefore, which forbids a motor carrier to transport commodities which it owns; and, even if there were, such provision would not prohibit the transportation of property owned by stockholders, United States v. South Buffalo R. Co., supra, and would furnish no compelling reason which would preclude the grant-

ing of a certificate of convenience and necessity where in the opinion of the Commission the public interest required it.

For the reasons stated the injunction will be denied and the suit will be dismissed.

Injunction denied and suit dismissed.