**BOND CROWN & CORK CO. v. FEDERAL TRADE COMMISSION.**

**CROWN MFRS. ASS'N OF AMERICA et al. v. FEDERAL TRADE COMMISSION.**

**ARMSTRONG CORK CO. et al. v. FEDERAL TRADE COMMISSION.**

Nos. 5813, 5814, 5817.

United States Court of Appeals Fourth Circuit.

Argued June 14, 1949.

Decided Aug. 22, 1949.

976

Roger A. Clapp, Baltimore, Md. (Albert E. Donaldson and Hershey, Donaldson, Williams & Stanley, Baltimore, Md., on the brief), for petitioners in No. 5814.

H. Bartow Farr, New York City (Willkie, Owen, Farr, Gallagher & Walton, New York City, Helmer R. Johnson, New York City, and Semmes, Bowen & Semmes, Baltimore, Md., on the brief), for petitioner in No. 5813.

Frank B. Ingersoll, Pittsburgh, Pa. (Rex Rowland, New Castle, Pa., and Smith, Buchanan & Ingersoll, Pittsburgh, Pa., on the brief), for petitioners in No. 5817.

Donovan R. Divet, Special Attorney, Federal Trade Commission, Washington, D. C. (W. T. Kelley, General Counsel, Walter B. Wooden, Associate General Counsel, and James W. Cassedy, Associate General Counsel, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

These are petitions to review and set aside an order of the Federal Trade Commission finding that the petitioners have been parties to a conspiracy and combination in restraint of trade constituting an unfair method of competition in violation of section 5 of the Federal Trade Commission Act, 38 Stat. 719, 15 U.S.C.A. § 45, and commanding them to cease and desist from carrying out any "planned common course of action" with respect to certain acts and practices found to be involved in the conspiracy. The petitioners are corporations engaged in manufacturing crown bottle caps, a trade association of these manufacturers and certain individuals holding office either in the corporations or the association. The Commission in its brief filed in this court consents that its order be vacated as to the individual petitioners, and no further attention need be given to them. The manufacturing corporations and the association ask that the order be vacated because not based on sufficient findings and because the findings are not supported by substantial evidence.

The case was heard before a trial examiner, who filed a report recommending that the commission find that there had been no conspiracy in restraint of trade or unfair trade practice in violation of the Trade Commission Act and that it dismiss the petition. Exceptions were filed to this report, and the commission made a complete finding of facts covering every aspect of the case and reached the conclusion that a combination and conspiracy in restraint of trade did exist and that a cease and desist order should issue. The findings of the commission are that the manufacturing petitioners control 85% of the business in question, that there is no price competition of any sort among them, but that absolute uniformity of prices and discounts has prevailed since 1938; that, through their association they considered uniform pricing techniques and a uniform contract in the year 1928, and that, although this uniform contract was not adopted, its provisions have been followed by petitioners; that through the association petitioners have worked out a standardization of product so that even in the matter of decoration the product of all petitioners is precisely the same; that in connection with patent licensing agreements the petitioner Crown Cork & Seal Company, which was the largest manufacturer of crown bottle caps, furnished lists of its prices to all the other petitioners for a period of many years and ceased only a short while before the institution of this proceeding; that such license agreements provided that the licensees should not sell at prices lower than those of Crown Cork & Seal; and that all of the manufacturing petitioners follow the uniform practice of equalizing the freight on shipments, with the result that the cost of goods plus freight is the same at any given point any where in the United States, no matter from which of petitioners the purchase is made. Upon these facts the commission found the existence of the conspiracy charged in the following language (13th finding): "The commission is of the opinion that in the circumstances shown to exist an understanding or agreement under which the respondents acted and still act in concert may be inferred. The intention

of the parties participating in the meeting of respondent association, held on July 24, 1928, for all members of the association to sell their products at one and the same price and under identical terms and conditions is clearly evident from the minutes of that meeting. The subsequent use by all such parties of the general pricing plan then formulated, including the schedules of deductions, additions, and differentials, and the adoption of such plan by all of the other respondent manufacturers, with the resulting uniformity in prices, terms and conditions of sale as among all such manufacturers, indicates just as clearly an intention of all of the parties to continue in effect the original understanding. In the opinion of the commission, there is a direct connection between this understanding and the admitted efforts of the respondents to standardize their products to such an extent that a prospective purchaser would have no choice in the realm of coloring, lettering, and decorations as between the products of any two manufacturers; and the concurrent use by all of the respondent manufacturers of the freight-equalization plan serving to maintain identical delivered prices for all purchasers at any given destination, adds materially to the combination of circumstances showing a deliberate and concerted effort on the part of the respondents to completely remove effective competition as among the sellers of crown bottle caps and discs used in connection therewith. Considering, in addition, the price-fixing provisions of the various license agreements, all of which exceeded the legitimate rights of the licensors to protect themselves in the enjoyment of the fruits of their inventions, the sum of all the other incidents referred to in the foregoing paragraphs, the commission has no difficulty in concluding, and therefore finds, that the respondents have in fact entered into and have engaged in and carried out an understanding, agreement, combination or conspiracy among themselves to restrain and suppress competition in the sale of their products. While the record does not show that each of said respondents has participated in all of the activities relied on to establish said understanding, or agreement, each has acted in concert and cooperation with one or more of the others in doing and carrying out some of the acts and practices herein set forth in furtherance of the understanding or agreement common to them all."

We think there can be no question but that this finding supports the order of the commission and we think it equally clear that it, in turn, is supported by the findings as to evidentiary facts which precede it and by the evidence in the case.

Crown bottle caps are the closures for bottles used by the brewing and bottling industry. They consist of metal shells enclosing cork discs and have long been substantially identical in construction and dimension. The Crown Cork & Seal Company, one of the petitioners, manufactures approximately 50% of those produced in this country and the other petitioners approximately 35%. In 1925 the trade association was organized and most of the petitioners were members of it. One of the first things that it did was to bring about more complete standardization of product in that, by agreement of the manufacturers, the decoration of the caps was made uniform, so that those sold by all manufacturers were identically the same. Another matter discussed at an early meeting of the association was the technique of arriving at prices with a view of having uniformity throughout the industry in the schedules of deductions, additions and differentials from base prices. This was to be incorporated in a standard form of contract; and, while the standard form was never adopted, the evidence is that throughout the industry there is as much uniformity in the deductions, additions and differentials allowed from base prices as if it had been adopted. No form of contract of any sort is used, but sales are made informally by correspondence or oral negotiation; and it appears that no written contract is needed, in view of the uniformity that has been attained throughout the industry with respect to matters which a contract would ordinarily embrace within its terms.

There is no proof of any express agreement to charge uniform base prices; but the evidence shows that since 1938 the pric-

es of all the manufacturing petitioners have been the same. Prior to 1938, there were but few changes, the same price, with minor variations, was charged by all, and, when changes in prices were made, they were made by all at about the same time. In 1933 Crown Cork & Seal granted licenses under patents which it held to most of the other manufacturing petitioners; and in connection with these licenses they agreed not to sell at a less price than that which Crown Cork & Seal established. It is significant that, in connection with these licenses, Crown Cork & Seal furnished a list of its prices to the licenses, who were under agreement not to sell for less. In the case of petitioner Gutman, where mutual licensing followed the adjustment of patent litigation, there was an exchange of prices, although neither party used the patents of the other. Not until 1941, shortly before the institution of the proceeding before the commission, was this furnishing of prices discontinued. Its continuance over so long a period of time furnishes adequate explanation of the uniformity of prices attained. The commission has found that, when it was discontinued, it was no longer necessary to maintain uniformity. Certainly, there have been no changes in prices of bottle caps since that time, notwithstanding the fluctuations in the prices of all other commodities. The question which arises with respect to these patent agreements is not whether a patentee may exact an agreement as to prices from a licensee who uses the patent, but whether such agreements under the circumstances here appearing support the charge of conspiracy to destroy competition and fix prices throughout the industry. See United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

The freight equalization practice to which reference has been made goes back at least as far as 1921. That practice is to sell the bottle caps f.o.b. the plant of the manufacturer with an agreement that the purchaser shall be credited with the difference between freight actually paid and that which would have been paid if purchase had been made from the nearest manufacturer. This practice has all the vice of the basing point system in that the purchaser pays the same delivered price, whatever manufacturer he purchases from, and the manufacturer must absorb the freight differential, so that the net selling price which he receives is different for different customers, depending upon their location. The effect of this practice in destroying competition and its importance in establishing the existence of the conspiracy charged is well stated by the commission in its ninth finding, from which we quote as follows: "This uniformity in base prices, together with the concurrent use by all the respondent manufacturers of the freight-equalization plan, inevitably means that a purchaser at any given locality will be required to pay exactly the same delivered price for crown bottle caps regardless of the manufacturer from which he purchases. It is undisputed that since 1938, at least, it has been impossible for any purchaser at any location to obtain crowns from any respondent manufacturer for a less price or on better terms than the prices charged or the terms imposed by any other respondent manufacturer. Even on privately decorated crowns the extra charges made by all of the respondent manufacturers have been the same. * * * Thus every respondent manufacturer is informed at all times of both the prices and the terms of sale quoted and offered by all of the others. In addition to knowledge of the base prices of all of the other respondent manufacturers, each such respondent manufacturer knows that every other respondent manufacturer uses the plan of equalizing freight with the location of the manufacturer nearest the purchaser. It knows, too, that by the use of this plan each will be able to deliver its products to every purchaser at any given destination for exactly the same delivered price as others using the plan, and thus all users of the plan will be able to present to a prospective purchaser a condition of matched prices in which such purchaser is deprived of any choice on the basis of price. * * * In order to produce such matched prices sellers of crowns must, at numerous destinations, accept net receipts for their products varying in amount according to the freight absorbed

as a result of the closer proximity to the purchaser of some other seller. Each participant in the use of the plan consciously intends that no attempt be made to exclude any seller of crowns from the natural freight-advantage territory of another, and by the use of the plan invites other sellers to share the available business in his natural market in return for similar treatment for itself in the trade territories of all' other participating sellers. The price rigidity existing in the crown bottle cap industry since 1938, and the failure of prices of crown bottle caps to respond in any way to changing conditions of supply and demand are not consistent with the existence of effective competition. The complete standardization of crowns as a result of the admitted efforts made by respondents, and other circumstances showing an overriding desire on the part of the respondents to present to a prospective customer a completely united front insofar as products, prices, and terms of sale are concerned, indicate the total absence of such competition. When, as in this industry, the price of the seller nearest the purchaser is always accepted by other sellers and there is no bargaining on any basis between buyers and sellers, fundamental requirements of a true competitive market are lacking and prices are not the result of market action in the economic sense, but are mere expressions of an artificial and monopolistic price structure."

 Innocent explanations are offered as to each of the circumstances relied on by the commission, and if it were permissible to consider each of the circumstances out of connection with the others, there would be much force in the argument of the petitioners. When all of the circumstances are considered together, as they must be, however, there can be no question as to their sufficiency to support the findings and conclusions of the commission. The standardization of product, for example, would be innocent enough by itself, but not when taken in connection with standarization of discounts and differentials, publication of prices with agreements not to charge less than a minimum under patent license agreements affecting practically the entire industry, the freight equalization which we have described and such uniformity of prices throughout the industry as to leave no price competition of any sort anywhere. The practice of freight equalization might be all right if used by the manufacturers individually, but not when used in connection with standardization of product, patent control, price publication and uniformity of discounts and trade practices in such way as to destroy price competition. As in the case of most conspiracies to restrain trade and destroy competition, there is no direct evidence of any express agreement to do what the law forbids; but no such evidence is required, nor is the commission required to accept the denials of those charged with the conspiracy merely because there is no direct evidence to establish it, for it is well settled that "The essential combination or conspiracy may be found in a course of dealings or other circumstances as well as in any exchange of words." Fort Howard Paper Co. v. Federal Trade Comm., 7 Cir., 156 F.2d 899, 905. Where, as here, the evidence is sufficient to support the findings of the commission, it is for that body, and not the courts, to say what conclusions are to be drawn from it. Federal Trade Comm. v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141; Federal Trade Comm. v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655.

 And the rule just stated is no different, as some of the petitioners seem to think, because the trial examiner reached a conclusion different from that of the commission. N.L.R.B. v. Laister Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9, 16-17. It is the commission, not the trial examiner, that is charged with ultimate responsibility for finding the facts; and it is the commission's findings and order that we are authorized to review under the express limitation that "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S. C.A. § 45(c). In point is Beard-Laney Co., Inc., v. United States, 83 F.Supp. 27, 33. In that case, it appeared that the order of a hearing division of the Interstate

Commerce Commission had been reversed on rehearing and it was argued that the usual rules for review of orders of the commission should not be applied for that reason. In answering this contention, the special statutory court of three judges said: "The rules to be applied in reviewing the order of the Commission are not different because that order resulted from a reversal of a prior decision of the hearing division upon a petition for rehearing. The fact that a rehearing was granted shows that the questions involved were carefully considered and the ultimate decision of the division, which received the approval of the Commission, was the final and definitive action of the Commission, which is what we are authorized to review; and it is to be reviewed in the same way and under the same limitations as other reviewable orders. We may not substitute our judgment for that of the Commission because upon a rehearing and fuller consideration of the facts it has arrived at a different conclusion from that which its hearing division had first expressed. Lang Transp. Co. v. United States, D. C., 75 F.Supp. 915, 925."

■ There has been a great deal of argument with regard to the practice of freight equalization. It should be noted in this connection, however, that the question in this case is, not whether such practice may be enjoined as constituting of itself an unfair trade practice, but whether it may be considered along with the other facts and circumstances to which we have adverted as tending to establish the conspiracy and combination in restraint of trade, which is the only charge of the complaint. We think that it was properly considered for that purpose. Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009; Triangle Conduit & Cable Co. v. Federal Trade Comm., 7 Cir., 168 F.2d 175; Milk & Ice Cream Can Institute v. Federal Trade Comm., 7 Cir., 152 F.2d 478, 481. As was well said by Judge Major of a similar freight equalization plan in the case last cited: "It is argued, perhaps correctly, that such a freight system had long been employed by industry so that members thereof might deliver their product at the same price. In fact, the Commission recognizes that this freight equalization plan was used by petitioners prior to the organization of the Institute. Such being the case, the fact still remains that it was employed by petitioners for the purpose of fixing the delivered price of their product and by such use price competition was eliminated or at any rate seriously impaired. On the face of the situation, it taxes our credulity to believe, as argued, that petitioners employed this system without any agreement or plan among themselves. * * *"

Whether viewed as an unfair trade practice in itself, or as evidence of the existence of a conspiracy, we see no practical distinction between the freight equalization practice here involved and the multiple basing point system before the Supreme Court in Federal Trade Commission v. Cement Institute, supra, 333 U.S. 684, 68 S.Ct. 793, 802, 92 L.Ed. 1009. Both result in "identity of prices and diversity of net returns." In speaking of the single basing point system, which had been condemned in Corn Products Refining Co. v. Federal Trade Comm., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320, and Federal Trade Comm. v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338, the Supreme Court, in the Cement Institute case, pointed out the results that flow from that system, saying: "One is that the 'delivered prices' of all producers in every locality where deliveries are made are always the same regardless of the producers' different freight costs. Another is that sales made by a non-base mill for delivery at different localities result in net receipts to the seller which vary in amounts equivalent to the 'phantom freight' included in, or the 'freight absorption' taken from the 'delivered price.'" The court then pointed out the "the multiple and single systems function in the same general manner and produce the same consequences—identity of prices and diversity of net returns. Such differences as there are in matters here pertinent are therefore differences of degree only." The same is true of the freight equalization practice here under consideration.

It is argued that the case here is distinguishable from the Cement Institute case because no "phantom freight" is involved; but there is involved freight absorption, resulting in equal delivered prices by all manufacturers selling in a given locality and unequal net returns to the manufacturers from sales to customers in different localities. So far as the questions before us are concerned, there can be no difference between phantom freight and freight absorption. See 333 U.S. at page 725, 68 S.Ct. at page 815, 92 L.Ed. 1009. Another argument is that the case here is distinguishable because there is no prohibition of the purchaser's taking delivery at the point of manufacture and thus eliminating freight altogether; but, so far as appears, no one has ever availed himself of this right, and the distinction does not seem to be one of any practical value. We need not decide, however, whether the freight equalization practice here involved constitutes of itself an unfair trade practice or whether it may be condemned as systematic price discrimination in violation of sec. 2 of the Clayton Act as amended by the Robinson Patman Act, 49 Stat. 1526, 15 U.S.C.A. § 13, as was held of the multiple basing point system in the Cement Institute case, as those questions are not before us. The practice unquestionably constitutes evidence to be considered, along with other facts and circumstances, as tending to establish the conspiracy charged; and that was the only purpose for which it was considered by the commission.

■ We conclude the discussion on the sufficiency of the evidence by adverting again to the indisputable fact that through the business practices followed by petitioners it has resulted that in an industry of which they control 85% there has been no price change in ten years and absolutely no price competition whatever. The product has been so standardized that there is no choice of any sort between the products of different producers, and a purchaser anywhere in the country can purchase at the same price including freight from any producer. It is argued that all this is the result of the free play of economic forces, but the commission did not think so; and this is just the sort of question that Congress intended the commission to decide. As was said by the Supreme Court of a similar argument in the Cement Institute case: "The Commission did not adopt the views of the economists produced by the respondents. It decided that even though competition might tend to drive the price of standardized products to a uniform level, such a tendency alone could not account for the almost perfect identity in prices, discounts, and cement containers which had prevailed for so long a time in the cement industry. The Commission held that the uniformity and absence of competition in the industry were the results of understandings or agreements entered into or carried out by concert of the Institute and the other respondents. It may possibly be true, as respondents' economists testified, that cement producers will, without agreement express or implied and without understanding explicit or tacit, always and at all times (for such has been substantially the case here) charge for their cement precisely, to the fractional part of a penny, the price their competitors charge. Certainly it runs counter to what many people have believed, namely, that without agreement, prices will vary—that the desire to sell will sometimes be so strong that a seller will be willing to lower his prices and take his chances. We therefore hold that the Commission was not compelled to accept the views of respondents' economist-witnesses that active competition was bound to produce uniform cement prices."

■ Petitioners contend that even though the order of the commission be upheld, the fifth paragraph, which relates to the practice of freight equalization should be stricken therefrom on the ground that it will interfere with the independent use of the practice of freight equalization by petitioners individually. The prohibitions of paragraph 5 have application, however, only to acts done in carrying out a "planned common course of action, understanding, agreement, combination or conspiracy". We dealt with the question here involved in American Chain & Cable Co.

982

v. Federal Trade Comm., 4 Cir., 139 F.2d 622, 623, where petitioner had suggested to the commission, without success, that it clarify a similar order by inserting a declaration that nothing therein was intended to prevent a manufacturer from independently continuing to engage in a given course of action. In affirming the action of the commission, this court, speaking through Judge Soper, after pointing out the history of the present form of the order and the fears of arbitrary action entertained by the petitioner, said: "It does not seem to us that the order needs further clarification. It is of course true that a cease and desist order must be certain and unambiguous in its prohibitive terms because business men must operate under it at their peril. * * * But, there can be no doubt that to sustain a charge of violation of the order in this case it must be shown that the prohibited acts have been performed as the result of an agreement or conspiracy, or as the result of a common course of action, that has been agreed upon or planned between two or more persons. If, as the result of such agreement or plan, the petitioners continue to co-operate in a common course of action which has been found to violate the statute, they make themselves liable to the prescribed penalties; and they have no just cause for complaint if in appraising the evidence in any case the triers of fact seek to determine whether there is any relation or connection between their past illegal acts and the conduct after examination. If such a relation or connection is found it may properly be condemned as a continuance of an unlawful conspiracy. Of course the influence of changed business conditions must be taken into account in reaching a decision; but there is no reason to believe that the Federal Trade Commission will fail in its duty in this respect or that the courts will hesitate to modify or reverse an order that is based on inferences not supported by the evidence."

 As we have already indicated, the commission consents that its order be modified so as to eliminate the individual petitioners. We think it should be modi-fied, also, to eliminate its application to cork discs. There is no sufficient evidence of any conspiracy or combination in restraint of trade with respect to cork discs, and no finding sufficient to support the application of the order to dealings therein. The evidence discloses that most of the manufacturers of crown bottle caps manufacture the cork discs which they use; and the inclusion of the latter commodity in the order does not seem to have any practical significance.

The order of the commission will be modified by striking therefrom the names of L. C. McAuliffe, E. J. Costa, Joseph C. Feagley and Benno Cohn and by striking the words "or cork discs" from the main body of the order and from the paragraph numbered one; and, as so modified, the order of the commission will be affirmed and enforced.

Modified and as so modified affirmed and enforced.