UNITED STATES ET AL. *v.* BALTIMORE & OHIO RAILROAD CO. ET AL.

No. 221. Argued December 12, 13, 1934.—Decided January 7, 1935.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Biggs, Assistant Attorney General Stephens,* and *Mr. Elmer B. Collins* were on the brief, for the United States and the Interstate Commerce Commission.

*Mr. Harold N. McLaughlin,* with whom *Mr. Thomas Stevenson* was on the brief, for Johnston et al., intervener-appellants.

*Messrs. Jacob Aronson* and *Nye F. Morehouse,* with whom *Messrs. R. V. Fletcher, Sidney S. Alderman, H. Z. Maxwell, Clarence A. Miller,* and *Alfred P. Thom, Jr.,* were on the brief, for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This is a direct appeal from the decree of the federal court for northern Ohio, setting aside an order, under the Boiler Inspection Act, entered by the Interstate Commerce Commission on January 5, 1933.

At the date of the order there were in use in the United States about 31,597 steam locomotives equipped with hand reverse gear and 28,925 equipped with power reverse gear.[1] Prior to the order, Rule 157, which prescribes the

---

[1] As described in the carriers' bill: " The reversing gear, or ' reverse gear ' as it is usually called, of a steam locomotive is the mechanism which controls the position and movement of the locomotive valve

reverse gear on locomotives, left it optional with railroads to equip them with either hand operated or power operated reverse gear.[2]   The order amended that rule so as to require the railroads to equip " with a suitable type of power operated reverse gear " all steam locomotives built on or after April 1, 1933; and similarly to equip, " the first time they are given repairs defined by the United States Railroad Administration as Class 3, or heavier," all steam locomotives then in road service " which weigh on driving wheels 150,000 pounds or more," and all then used in switching service " which weigh on driving wheels 130,000 pounds or more."   The order required that, in any event, all such steam locomotives be so equipped before January 1, 1937; and that " air operated reverse gear [including thus power gear already installed] shall have a suitable steam connection " so arranged " that in case of air failure steam may be quickly used to operate the re-

---

gear and valves which admit steam into the cylinders, and it is by means of this mechanism that the direction of movement of the locomotive is controlled, and the proper and economical use of steam is accomplished.   Two general classes of reverse gears are in use, viz: (1) Manually operated reverse gears which depend upon the use of muscular force of the engineer and the force exerted by the counterbalancing weights and springs, for their operation; and (2) power reverse gears which supplement the above-mentioned forces with an auxiliary mechanism which, in normal operation, brings the force of compressed air into play, so that less muscular effort is normally required to be put forth by the engineer in using this type of gear. The engineer operates either class of gear by means of either a lever or handwheel (used with screw type of gear) located near his seatbox in the locomotive cab."

[2] Rule 157: " Reverse Gear.—Reverse gear, reverse levers, and quadrants shall be maintained in a safe and suitable condition for service.   Reverse lever latch shall be so arranged that it can be easily disengaged, and provided with a spring which will keep it firmly seated in quadrant.   Proper counterbalance shall be provided for the valve gear."

verse gear." A. Johnston *v.* Atlantic Coast Line R. Co., 190 I. C. C. 351.

The order of the Commission was ·entered on a complaint of the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen. The complaint alleged, in substance, that while power reverse gear is a suitable, safe and practical device, manually operated reverse gear is inherently unsafe and unsuitable in principle and design; that it subjects employees and the traveling public to unnecessary peril; and that the use of locomotives equipped with hand reverse gears violates the Boiler Inspection Act. The complaint prayed that the Commission prescribe rules requiring that all steam locomotives be equipped " with power reverse gear, or other devices adequate to protect the employees upon said locomotives from unnecessary peril to life or limb, as provided in section 2," of the Act.

Practically all the railroads of the United States were made respondents. They challenged in their answers the jurisdiction of the Commission on the grounds that the procedure was unauthorized and that a power reverse gear was not a safety device or appliance within the meaning of § 2 of the Boiler Inspection Act; denied the essential allegations of the complaint; and, as additional reason for refusing its prayer, set up the impaired financial condition of the carriers. These issues were referred for hearing to an examiner. Fifty-five days were devoted to the taking of testimony. The witnesses numbered 337. Their testimony covered 6,491 pages. There were introduced, in addition, 109 exhibits, many of them voluminous. The proposed report of the Examiner occupies 40 pages of the printed record in this Court; and the railroads' exceptions to it, 60 pages. The exceptions were heard by a Division of the Commission consisting of three

members; and reargument before the whole Commission was denied.

This suit to set aside the order was brought by Baltimore & Ohio Railroad and other carriers, suing on behalf of themselves and substantially all the other railroads. The original defendant was the United States. The Commission, Grand Chief Johnston of the Brotherhood of Locomotive Engineers and President Robertson of the Brotherhood of Locomotive Firemen and Enginemen are defendants by intervention. The case was heard by the District Court, three judges sitting, on a transcript of the record before the Commission. The railroads again contended that the Commission lacked authority to entertain the complaint. They insisted also that the order was void for lack of essential findings of fact. These objections were overruled. But the court, citing among others, *The Chicago Junction Case*, 264 U. S. 258 and *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, set the order aside, on the ground that the Commission had acted arbitrarily, in failing to give consideration and legal effect to pertinent, uncontradicted facts having a controlling bearing upon the issues, and in disregarding undisputed evidence. 5 F. Supp. 929. An appeal to this Court by all the defendants was allowed. The appellants contended that the action of the District Court constituted substitution of its judgment for that of the Commission. The argument here was devoted, in large part, to the consideration of the findings of the lower court charging disregard by the Commission of the evidence before it. For reasons which will be stated later, we have no occasion to enter upon that enquiry.

*First.* The Commission clearly has authority, in an appropriate proceeding, to forbid the use of a locomotive equipped with a manually operated reverse gear if, by reason thereof, the engine is rendered unsafe or subjects employees of the railroad or others to " unnecessary peril

to life or limb." The substitution of power operated reverse gear for manually operated reverse gear, might conceivably be found necessary to promote safety, even if it did so only indirectly by preventing the impairment of the health of engineers through excessive exertion or fatigue. To require the installation of power operated reverse gear is, in its nature, within the scope of the authority delegated to the Commission. For " the power delegated to the Commission by the Boiler Inspection Act as amended is a general one.[3] It extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Napier* v. *Atlantic Coast Line,* 272 U. S. 605, 611.

*Second.* The railroads contend that, in the proceeding under review, the Commission lacks authority to make any change of the existing rule concerning reverse gears; that authority to initiate changes in existing rules was denied to it; that the rules governing boilers and their appurtenances approved June 2, 1911, and the additional ones governing locomotives, tenders and appurtenances approved October 11, 1915, cannot be changed except upon application of the carriers or with their consent. The argument is that the Boiler Inspection Act is an independent and complete piece of legislation and thus the Commission is denied in respect to locomotives those general powers which it exercises in other connections; that by the original Act of 1911 the right to initiate rules was by § 5 conferred not upon the Commission, but upon the several railroads and, only to the extent that one or more of the carriers failed to act within three months, upon the chief inspector; that the Commission's power of requiring modifications was limited to the rules originally filed; that in respect to subsequent changes therein,

[3] February 17, 1911, c. 103, § 2, 36 Stat. 913; amended March 4, 1915, c. 169, 38 Stat. 1192; June 7, 1924, c. 355, 43 Stat. 659.

its sole function is that of approval or disapproval of the carriers' proposals; and that the Commission's only other authority in respect to locomotives is that, conferred by § 6, of reviewing the action of the chief inspector in declaring individual locomotives unfit for service.

To hold that the authority of the Commission is thus limited would defeat, in large measure, the purpose of the legislation; and would be inconsistent with long established practice. Congress imposed the strictly administrative duties, in the main, upon the chief inspector. But it specifically directed, in § 6, that the " first duty [of the district inspectors] shall be to see that the carriers make inspections in accordance with the rules and regulations established or approved by the Interstate Commerce Commission." Upon the Commission were conferred, besides some strictly administrative powers, both quasi-legislative and quasi-judicial functions. The latter it was authorized to exercise only in the appellate capacity of reviewing, under § 6, orders of the chief inspector declaring an individual locomotive unserviceable. Its legislative power was to be exercised in the making of rules. Section 5 of the original Act provided that " each carrier subject to this Act shall file its rules and instructions for the inspection of locomotive boilers with the chief inspector within three months after the approval of this Act, and after hearing and approval by the Interstate Commerce Commission, such rules and instructions, with such modifications as the commission requires, shall become obligatory upon such carrier." When this Act was passed, in 1911, there were doubtless already in force on each railroad some rules established by the carrier. And likewise, in 1915 and in 1924, when the scope of the Act was extended, there were doubtless in force on each railroad rules established by the carrier governing parts, appurtenances or engines, not falling within the field covered by the previously existing legislation. Naturally those carrier-

rules would be the starting point in the Commission's rule making; and, naturally, it would be much influenced, as well as instructed, by the chief inspector's proposals or recommendations. But the responsibility for rules adequate to ensure safety was imposed by Congress upon the Commission; and to discharge that duty, it was essential that the Commission, also, should possess the initiative in rule making. To this end, it was granted the power, not only of disapproving proposed rules, but also of requiring modifications of those in force. The power so conferred may obviously be exercised, as was done here, on complaint of the Brotherhoods representing employees directly affected.

In the *Napier* case, the question directly before the Court was not the authority of the Commission to initiate rules. It was the validity of state laws and rules prescribing specific safety devices on locomotives. But the objection now raised by the railroads was discussed by counsel and was considered by the Court. The validity of the state laws and regulations was challenged on the ground that the Boiler Inspection Act had occupied the field; and as the question whether it had done so was one of statutory construction, the provisions of the Act were necessarily examined. The conclusion that the Commission possesses the authority to make rules on its own initiative, or upon complaint, was the basis of the decision there made. (See pp. 611–613.) Referring to the argument of the States " that the authority delegated to the Commission does not extend to ordering the use or installation of equipment of any kind, *Baltimore & Ohio R. R. Co.* v. *Groeger,* 266 U. S. 521," we said: " The duty of the Commission is not merely to inspect. It is, also, to prescribe the rules and regulations by which the fitness for service shall be determined. Unless these rules and regulations are complied with, the engine is not ' in proper condition ' for operation. Thus the Commission

sets the standard. By setting the standard it imposes requirements. The power to require specific devices was exercised before the amendment of 1915 and has been extensively exercised since." In closing the opinion, we added: " If the protection now afforded by the Commission's rules is deemed inadequate, application for relief must be made to it. The Commission's power is ample."

In the *Napier* case this Court listed in the margin 18 rules which had, before 1925, been amended by order of the Commission.[4] Acting upon the suggestion there made by this Court, the state authorities and the Brotherhoods applied to the Commission for relief in proceedings similar to those here under review and rules were prescribed by it. All the railroads either conceded its authority to do so or acquiesced in its final orders. Cab Curtain Case, 142 I. C. C. 199, 201; Fire Door Case, 151 I. C. C. 448, 450. Compare Rules for Testing other than Steam Power Locomotives, 122 I. C. C. 414; *Staten Island Rapid Transit Ry. Co.* v. *Public Service Commission*, 16 F. (2d) 313.

*Third.* The railroads contend that to support the order certain basic findings are essential; that these were not made; and that, hence, the order is void. This contention is in our opinion sound. The Act does not confer upon the Commission legislative authority to require the adoption on locomotives of such devices as, in its discretion, it may from time to time deem desirable. The operation of an engine, however equipped, involves some " danger to life or limb." At common law the carriers were " free to determine how their boilers should be kept

---

[4] The railroads state that the Commission's orders disclose that " a considerable number " of the changes were brought about as a result of conferences between the chief inspector and committees representing all the railroads, or upon requests of representatives of the carriers, which modifications were agreed to by the representatives of the employees interested and by the chief inspector.

in proper condition for use without unnecessary danger."
*Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521, 529.
And the Act conferred authority to prescribe by rule
specific devices, or changes in the equipment, only where
these are required to remove " unnecessary peril to life or
limb." The power to make the determination whether
the proposed device or change is so required, vests in the
Commission. But its finding to that effect is essential to
the existence of authority to promulgate the rule; and
as Congress has made affirmative orders of the Commis-
sion subject to judicial review, *The Chicago Junction
Case,* 264 U. S. 258, 263–265,[5] the order may be set aside
unless it appears that the basic finding was made. *Flor-
ida* v. *United States,* 282 U. S. 194.

The primary question of fact presented for deter-
mination was, as the report of the Commission states,
" whether the use of locomotives equipped with hand re-
verse gear, as compared with power reverse gear, causes
unnecessary peril to life or limb." The report discusses,
at some length, the alleged advantages and disadvantages
of the two classes of reverse gear and the expense which
the proposed change would entail; and concludes with
" findings " that, to a certain extent, the change should
be made.[6] But whether the use of any or all types of

---

[5] Compare *United States* v. *Atlanta, B. & C. R. Co.,* 282 U. S. 522,
527–529.

[6] The closing paragraphs of the report are: " On the record in this
case we conclude and find that the safety of employees and travelers
on railroads requires that all steam locomotives built on or after
April 1, 1933, be equipped with a suitable type of power-operated
reverse gear.

" We further find that all steam locomotives used in road service
built prior to April 1, 1933, which weigh on driving wheels 150,000
pounds or more, and all steam locomotives used in switching service
built prior to April 1, 1933, which weigh on driving wheels 130,000
pounds or more, shall have such power-operated reverse gear applied
the first time they are given repairs defined by the United States

steam locomotives " equipped with hand reverse gear as compared with power reverse gear causes unnecessary peril to life or limb," is left entirely to inference. This complete absence of " the basic or essential findings required to support the Commission's order " renders it void. *Florida* v. *United States,* 282 U. S. 194, 215. Compare *Wichita Railroad & Light Co.* v. *Public Utilities Comm'n,* 260 U. S. 48, 58–59; *Mahler* v. *Eby,* 264 U. S. 32, 44–45.[7]

In the *Florida* case the legal distinction was pointed out between what may be termed quasi-jurisdictional findings, there held to be indispensable, and the " complete statement of the grounds of the Commission's determination " which was declared in *Beaumont, S. L. & W. Ry. Co.* v. *United States,* 282 U. S. 74, 86, to be desirable for a proper consideration of the case in the courts. The lack of such a complete statement, while always regrettable, because unnecessarily increasing the labor of

---

Railroad Administration as class 3, or heavier, and that all such locomotives shall be so equipped before January 1, 1937.

" We further find that air-operated power reverse gear should have a suitable steam connection so arranged and maintained that it can quickly be used in case of air failure.

" An appropriate order amending our rules for the inspection and testing of steam locomotives and tenders and their appurtenances to give effect to these findings will be entered."

[7] The objection presented here is similar to that urged upon the Court in *United States* v. *Louisiana,* 290 U. S. 70, 80. There, however, the Court was satisfied that the essential findings had been made, although " the particular form in which they were cast [was] not to be commended." Compare *Georgia Comm'n* v. *United States,* 283 U. S. 765, 773; *Alabama* v. *United States,* 283 U. S. 776, 779; *Louisiana Public Service Comm'n* v. *Texas & N. O. R. Co.,* 284 U. S. 125, 132; *Illinois Commerce Comm'n* v. *United States,* 292 U. S. 474, 481–483; *Ohio* v. *United States,* 292 U. S. 498, 511; *Montana* v. *United States,* 2 F. Supp. 448, aff'd 290 U. S. 593; *Kentucky* v. *United States,* 3 F. Supp. 778. See, too, *New York* v. *United States,* 257 U. S. 591, 600.

the reviewing court, compare *Virginian Ry.* v. *United States,* 272 U. S. 658, 675, is not fatal to the validity of the order. It is true that formal and precise findings are not required, under § 14 (1) of the Interstate Commerce Act, which declares that the report " shall state the conclusions of the Commission together with its decision." [8] Compare *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 487; *Meeker & Co.* v. *Lehigh Valley R. Co.,* 236 U. S. 412, 428. That provision relieves the Commission from making comprehensive findings of fact similar to those required by Equity Rule 70½. But § 14 (1) does not remove the necessity of making, where orders are subject to judicial review, quasi-jurisdictional findings essential to their constitutional or statutory validity.[9]

*Affirmed.*

---

[8] The original Act of February 4, 1887, c. 104, § 14, 24 Stat. 384, which had prescribed that the report should " include findings of fact upon which the conclusions of the Commission are based," was amended by § 3 of the Act of June 29, 1906, c. 3591, 34 Stat. 589, so as to require (except in reparation cases) that it shall make a report " which shall state the conclusions of the commission together with its decision, order, or requirement in the premises."

[9] A different rule .has been applied to executive action not subject to review. Compare *Philadelphia & Trenton R. Co.* v. *Stimpson,* 14 Pet. 448, 458; *United States* v. *Chemical Foundation,* 272 U. S. 1, 14–15.