**ALABAMA GREAT SOUTHERN R. CO. et al. v. UNITED STATES et al.**

No. 49C1434.

United States District Court
N. D. Illinois, E. D.

Jan. 12, 1950.

984

Harold E. Spencer, Chicago, Illinois, for plaintiffs.

Otto Kerner, Jr., U. S. Attorney, Chicago, Illinois, for defendant.

C. R. Hillyer, Chicago, Illinois, Wayne M. Hoffman, Chicago, Illinois, Wm. J. Fanning, Chicago, Illinois, for interveners.

Before LINDLEY, Circuit Judge, and SULLIVAN and IGOE, District Judges.

LINDLEY, Circuit Judge.

This is an action to set aside and enjoin the order of the Interstate Commerce Commission entered in a proceeding entitled Rail and Barge Joint Rates, No. 26712. The Commission, by order of October 8, 1934, instituted this proceeding as a general investigation into the lawfulness of differentials then existing between all-rail rates and barge-rail rates, established by the Commission in the three years from April, 1929, to March, 1932. In the course of extensive hearings during the ensuing eight years, more than 16,000 pages of testimony and over 1,500 statistical exhibits were received in evidence. Upon conclusion of the hearings, an examiner submitted a report, to which exceptions and replies were filed by all interested parties. Following oral argument before the entire Commission, that body, on July 7, 1948, issued its report and order, which, as modified and corrected by its supplementary report of June 13, 1949, required common carriers by rail and water to establish joint rates over certain through routes specified in the report, these joint rates to be based upon the differentials prescribed in said report. Plaintiffs contend that the order is arbitrary and beyond the Commission's authority, and urge that it be set aside and its enforcement perpetually enjoined.

A brief history of the controversy which lies at the root of this cause may be of some assistance in its resolution. The Federal Control Act of March 21, 1918, 40 Stat. 451, which directed the Railroad Administration to establish water transportation on certain inland waterways, was the first step in the attempted revival of water transportation on the Mississippi River and its tributaries, and the Warrior River. Before any conclusive evidence relative to the propriety of this undertaking was obtained, the war had ended, but Congress, in the Transportation Act of 1920, 41 Stat. 456, provided for continuation of the Mississippi-Warrior barge line service, directing that its operations be under the control of the War Department. Four years later, Congress created the Inland Waterways Corporation, of which the Secretary of War was the sole incorporator, and transferred to it the direction of this enterprise. This arrangement persisted until July 1, 1939, when supervision of the Inland Waterways Corporation, operator of the Federal Barge Lines, passed to the Department of Commerce. Meanwhile, privately owned and operated common car-

riers by water had become active on the Mississippi, and this fact impelled Congress to include in the Transportation Act of 1940, Part III of the Interstate Commerce Act, 49 U.S.C.A., § 901 et seq., a comprehensive plan for regulation, by the Interstate Commerce Commission, of all water carriers engaging in interstate commerce, this legislation having as its declared purpose the preservation of the inherent advantages of each mode of transportation through the impartial regulation of all

In 1918, the Director General of Railroads, recognizing that shippers would not avail themselves of the slower, more hazardous barge service unless the barge rates were lower than the all-rail rates between the same points, determined that the port-to-port rates should be 80% of the all-rail rates between the same ports, and that the same differential should be applied to shipments moving through the same ports over joint rail-barge routes. This rate system was put into effect over certain through routes designated by the Director General. After 1920, when the War Department took control of Federal Barge Lines, unsuccessful attempts to persuade the railroads to enlarge the existing joint-rate structure culminated in the filing of a complaint with the Interstate Commerce Commission, in which Federal asked the Commission to prescribe joint rail-barge rates over a number of routes suggested by Federal. The Commission, observing that many of the proposed routes were unduly circuitous and that there was insufficient evidence to enable it to determine which, if any, of the others should be established, suggested that joint rates over some of the routes might better be established through friendly negotiations with the rail lines. Some new joint rates were fixed in that fashion, but the results were, on the whole, so unsatisfactory that Congress, in 1928, passed the Denison Act, which directed the Commission to issue certificates of public convenience and necessity to common carriers by water on the Mississippi, the Warrior, and their tributaries, and, in the event the railroads refused voluntarily to establish through

routes and joint rates with such carriers, authorized the Commission to establish such routes and rates and to "fix reasonable minimum differentials between all rail rates and joint rates in connection with said water service."

The Commission, acting under the authority conferred on it by this act, granted certificates of public convenience and necessity to Federal Barge Lines, Mississippi Valley Barge Line Company, and American Barge Line Company, and announced the so-called Ex Parte 96 formula for determining whether additional through routes proposed by the barge lines should be established. This formula, which was designed to avoid the establishment of through routes which would be unduly circuitous or over which the barge line's portion of the joint haul would be so short that the interchange expense would offset the assumed economies of water transportation, provided that the joint rates over the routes which were established should incorporate the 20% differential first adopted by the Director General in 1918, except that, for such routes as barely met the distance requirements of the formula, the differential should be only 10% of the all-rail port-to-port rate. Railroad complaints attacking the reasonableness of the rates and differentials fixed pursuant to the Ex Parte 96 formula led the Commission to undertake the general investigation out of which the present controversy arises.

At the outset of this proceeding the railroads announced their intention of showing that, contrary to popular belief, the cost of transporting freight over barge-rail routes was not less but, on the contrary, actually more than the cost of transporting it all-rail. The barge lines insisted that this was not true. Both sides introduced voluminous evidence relative to their respective costs of service, all of which was referred by the Commission to its cost section for study and interpretation. Although the cost section concluded generally that the cost of joint rail-barge shipping was greater than that incurred in direct all-rail routing and that this was due chiefly to the added terminal handling involved in joint rail-barge traffic, the Com-

mission declined to review this conclusion or to make any finding as to relative all-rail and barge-rail costs in the period covered by the cost studies (1933-1938) because, as it said, "since then there have been radical changes in the conditions affecting cost of transportation service by barge as well as by rail." The Commission did state that "we cannot find that at the present time there are demonstrable economies in barge-rail transportation * * * which from the standpoint of cost of service would justify differentials." However, the Commission felt that the proviso, in section 307(d) of the Transportation Act of 1940, 49 U.S.C.A. § 907(d), that "In the case of a through route, where one of the carriers is a common carrier by water, the Commission shall prescribe such reasonable differentials as it may find to be justified between all-rail rates and the joint rates in connection with such common carrier by water," did not mean, as the railroads contended, that proof of lower cost of barge-rail service was a necessary condition precedent to the exercise of its authority to prescribe differentials between all-rail and barge-rail rates, and, finding that the differentials set forth in the appendix to its report, were "justified as reasonable" and "necessary and desirable in the public interest," it ordered the railroads and the barge lines to establish joint rates based on such differentials. These differentials, it might be observed, do not result in the establishment of a wholly new system of joint barge-rail routes and rates; they are, rather, revisions of and additions to the rate structure created under the Ex Parte 96 formula, which was in effect when the commission's general investigation was initiated.

The position of the plaintiffs, in short, is that, because the Commission could find no demonstrable economies in the barge-rail service which, from the standpoint of cost of service, would justify differentials, there is no legal basis for the Commission's order, based, as they say, solely on its belief that the order is in accord with Con-gressional intent and policy. They urge that the order, far from carrying out the intent of Congress, violates the national transportation policy, as declared in the Transportation Act of 1940, by depriving the railroads of their inherent advantage of lower cost of service and giving to the water carriers advantages to which they are not entitled on their merits and which Congress did not intend them to have. Finally, the plaintiffs contend that the order is not supported by basic findings of fact, and that this failure to disclose the basis on which the differentials were determined renders it arbitrary and unlawful. The United States, the Commission, and the intervening barge line defendants contend that the order is fully supported by findings based on substantial evidence and that it is in accord with Congressional policy and within the statutory authority of the Commission.

Plaintiffs, asserting that by the Commission's own rule, the basis for barge-rail differentials is that the service costs less and is worth less than rail service, argue that, because the Commission found no economies in barge-rail transportation which from the standpoint of cost of service would justify rate differentials, it was precluded from prescribing such differentials. That the Commission has, on numerous occasions, stated that the lower cost and lower value of water transportation provide the basis for the existence of rate differentials cannot be doubted, Inland Waterways Corp. v. Alabama Great Southern R. Co., 151 I.C.C. 126, 144, Inland Waterways Corp. v. Aberdeen & R. R. Co., 183 I.C.C. 761, 765, but it has never indicated that proof of lower cost of service is an absolutely essential condition for creation of such differentials. Moreover, it is not at all clear that the lesser cost of the service, which is characterized as "the important factor," from the standpoint of public policy, on which rate differentials are based, means lower *operating costs;* rather does it seem more likely that the phrase means lower *costs to the public.** And finally, plaintiffs' insistence that lower

---

* In I.C.C. v. Mechling, 330 U.S. 567, 580, 67 S.Ct. 894, 901, 91 L.Ed. 1102, the Supreme Court said: " * * * Congress knew that barge line rates were cheaper

costs are essential to the existence of differentials completely ignores one of the fundamental principles of economics, namely, that the price of a product or a service is determined by its *value* to the consumer. Of course, operating costs incidentally affect the price by establishing a level below which the price cannot be allowed to fall, but, above that level, it is the value to the consumer which finally determines what the price will be.

■ In the instant case, assuming that the operating costs of the railroads are less than those of the barge lines, it does not follow that joint barge-rail rates should be equal to or greater than all-rail rates, for so to hold would be utterly to disregard the relative values of the respective services and, incidentally, to end effectively all joint barge-rail traffic, since that traffic depends on the existence of rates differentially lower than those charged by the railroads, which provide to the shipper a far superior service. More important, then, than the relative operating costs of rail and water carriers is the relationship between the rate charged by the rail carrier and the operating costs incurred by the water carriers. So long as the all-rail rate is greater than the operating costs incurred in the transportation of barge-rail freight, the railroads have no cause to complain that the rate fixed for the inferior service, if fixed somewhere in the region between the barge-rail operating cost and the all-rail rate, is lower than that prescribed for the superior service. Only when the rates charged by the railroads are so low that joint barge-rail freight cannot be transported profitably at a lower rate—i. e., when barge-rail operating costs approach

than rail rates, wanted the shippers to get full benefit of them, and left the Commission no power to take that benefit away from shippers by adjusting rail-barge traffic competition or rates."

** Of course, if the railroads were petitioning the Commission for a reduction in all-rail rates, proof of lower operating costs might well warrant such a reduction, but it is difficult to see how the lower costs of the railroads, if satisfactorily proven, would warrant an increase in the rates of a competitor.

all-rail rates—will there be reason to deny the inferior service the right to exist.** In the joint rates established the railroads retain their regular rates; the differential between the all-rail rates and the rail-barge rates is absorbed by the barge lines.

■ The statutory provision empowering the Commission to prescribe differentials (Section 307(d) of the Transportation Act of 1940) does not make the exercise of this power conditional on an affirmative showing of lower operating costs, but directs that " * * * the Commission shall prescribe such reasonable differentials as it may find to be justified * * *." As the Commission stated in its report, "Neither the wording nor the legislative history of that section supports the conclusion that differentials are justified only where there is * * * an affirmative showing (of lower operating costs.)"

■ Plaintiffs' contention that the order is not supported by basic findings of fact but is based solely on the presumed intent of Congress, and that it is, consequently, an arbitrary act without any legal basis must also be rejected. Although the Commission placed great emphasis on what it conceived to be the policy of Congress, it is evident from the report that numerous other factors were given due consideration by the Commission. It was fully cognizant of the inferiority of the service afforded by the barge lines,*** a factor which it had previously designated as one basis for barge-line differentials. Inland Waterways Corp. v. Alabama Great Southern R. Co., 151 I.C.C. 126, 144. It regarded the shippers' evidence as "of significance because it indicates a fairly unanimous view

*** On page 608 of its report, the Commission stated: "Much evidence was presented by shippers to show that from the standpoint of service barge transportation is inferior to all-rail. The principal disadvantage is the longer time involved. * * * Transfer of shipments from barge to railroad car or vice versa increases freight damages. * * * In the case of some commodities, barge transportation to some extent is conducive to deterioration or shrinkage on account of the slow transit, or contamination through contact with other freight."

that the principal object in shipping by barge is to save transportation expense," and, aware that the abolition of differentials would end all barge-rail traffic, concluded that, in the light of the "clear Congressional policy" of aiding and encouraging the development of water transportation on the Mississippi and its tributaries, "joint barge-and-rail routes and rates generally are necessary and desirable in the public interest and differentials between such rates and all-rail rates are justified."

Turning to the prescription of specific differentials, plaintiffs assert that it is impossible to determine how they were arrived at, but, again, the Commission's report indicates otherwise. Comprehensive proposals for the establishment of differentials were under consideration by the Commission, which, while expressing its belief that "the requirement that the barge line absorb the differential in its division of the joint rate in and of itself provides some measure of safe-guard against the performance of uneconomical barge-and-rail service where the barge line is privately operated, "rejected certain differentials proposed by the Mississippi Valley Association because they "would be much too low to permit the barge lines to absorb the differentials without serious revenue effect." Weighing the merits of the various proposals, it found that Federal's proposal was "conservative with respect to the measure of the differentials"; and, pointing to Federal's experimental status, it concluded that "Federal should not be compelled to accept a lower level of joint rates than it considers necessary in the absence of evidence that its proposed rates would be unreasonably high." Although indicating that the Ex Parte 96 formula would not be rigidly adhered to because it had, in the past, produced "some unsatisfactory port relations and other inconsistencies," the Commission declared that "the circuity and relative-service restrictions in the formula are sound in principle" and rejected certain routes proposed by Valley because they were excessively circuitous.

From the foregoing discussion, it would seem apparent that the Commission, far from acting arbitrarily, fixed the differentials only after due consideration of all the relevant factors and evidence, and that they are the product of the Commission's expert, informed judgment on the subject. As the Supreme Court said in Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 592, 69 S.Ct. 278, 288, "Rate structures are not designed merely to favor the revenues of producers and carriers. The Commission has the consumer interest to safeguard as well. And when it undertakes to rationalize the interests of the three, great complexities are often encountered. * * * We would depart from our competence and our limited function in this field if we undertook to accommodate the factors of transportation conditions, distance and competition differently than the Commission has done in this case. That is a task peculiarly for it. * * * The result is that the administrative rate-maker is left with broad discretion as long as no statutory requirement is overlooked."

Plaintiffs, however, insist that the statutory requirements have not been met in this case,—that the order is not supported by basic findings of fact and that, contrary to the provisions of Section 307(d) of the Transportation Act of 1940, it deprives the railroads of their inherent advantage of lower operating costs. Section 14(1) of the Interstate Commerce Act, 49 U.S.C.A. § 14(1), provides: "That whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order, or requirement in the premises; and in case damages are awarded such report shall include the findings of fact on which the award is made." This statute would seem to provide the conclusive answer to plaintiffs' charge that the order is invalid because not supported by basic findings of fact, for it indicates that, except where damages are awarded, the report need not contain findings of fact expressly labelled as such. Here, subsequent to its investigation, the Commission made a "report in writing," setting forth its "conclusions" that barge-rail differentials, as prescribed, were rea-

sonable, were justified, and were necessary and desirable in the public interest, together with its "order." Although the formal findings consisted only of findings of ultimate facts, the Commission's report, as has been pointed out, discloses that those ultimate conclusions have ample support in the evidence and in informally stated findings contained therein. The Supreme Court, recognizing that Section 14 (1) of the Interstate Commerce Act, relieves the Commission from making "comprehensive" findings of·fact, has held that an order of the Commission is valid if supported by what it called "quasi-jurisdictional" findings, State of Florida v. United United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, United States v. Baltimore & Ohio R. R. Co., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587; here, the Commission's conclusions, worded in the language of the statute authorizing the Commission to enter the order, seem to us to comprise the "quasi-jurisdictional" findings which the Supreme Court has declared essential.

■■■ The railroads' contention that the order deprives them of their inherent advantage of lower operating costs rests, of course, on the premise that the cost of shipping all-rail is, in fact, less than the cost of shipping barge-rail. However, in view of the fact that the cost information before the Commission was some ten years old, it seems obvious that the Commission was not required to find, on the basis of that evidence, that all-rail costs are lower than barge-rail costs; and, that the railroads' cost date was obtained by the use of average system costs based on the total freight traffic carried by the respective railroads and did not purport to represent the actual costs incurred in transporting barge-rail freight over the routes in question strengthens this conclusion. Baltimore & Ohio R. R. Co. v. United States, 298 U.S. 349, 380-381, 56 S.Ct. 797, 80 L.Ed. 1209. The Commission, apparently of the opinion that the cost evidence before it was inadequate to support any affirmative finding as to relative costs.**** was, however, faced with certain obvious facts,— the sharp decline in joint barge-rail traffic in recent years, the high operating costs and ensuing financial difficulties encountered by Federal which, operating with outmoded equipment, both terminal and floating, was the only one of the major barge lines to haul an appreciable amount of joint barge-rail freight, the virtual embargoes imposed on such freight by the financially sound and better equipped Valley and American lines, all of which led it to state that "In the face of these facts, we cannot find that at the present time there are demonstrable economies in barge-all transportation * * * which from the standpoint of cost of service would justify differentials." Such a negative conclusion, we think, cannot be said to constitute an affirmative finding that all-rail costs are lower than barge-rail costs; in the absence of such a finding, and in the absence of evidence requiring such a finding, the argument that the order deprives the railroads of the inherent advantage of lower costs must be rejected, for plaintiffs have failed to establish the premise on which the argument is based.

■■■ The position of the intervening complainants is that the order violates Sections 1 and 3 of the Interstate Commerce Act, 49 U.S.C. in that it gives New Orleans shippers an unjust preference over shippers in Savannah, Houston, and Dallas respectively, by prescribing unreasonably low barge-rail rates, and that it, therefore, violates Article I, Section 9, Clause 6 of the Constitution, which prohibits a preference of the ports of one state over those of another. If the prescribed barge-rail differentials are reasonable and justified as between the barge lines and the railroads, as it seems to us they are, then the contention that the order prescribes unreasonably low barge-rail rates or unduly prefers New Orleans over Savannah and the

---

**** The Commission's report states that "no useful purpose would be served by reviewing * * * (the cost data) * * * with a view to making a finding as to relative all-rail and barge-and-rail costs in the period 1933–38, which the cost studies covered. Since then there have been radical changes in the conditions affecting cost of transportation service by barge as well as by rail."

Texas ports becomes, in effect, a complaint against any rate structure which provides to shippers who are in a position to transport their goods by water, rates which are lower than those available to shippers who are not so located. But it is not the function of the Commission to equalize natural geographic advantages; nor do such advantages constitute undue preferences within the meaning of Section 3 of the Interstate Commerce Act. In Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 46, 32 S.Ct. 22, 24, 56 L.Ed. 83, where the Supreme Court, speaking through Mr. Justice Holmes, announced the principle, since adhered to by the Commission, that "The law does not attempt to equalize fortune, opportunities, or abilities."

The contention that the Commission's order violates the ports preference clause of the Constitution is, we think, settled by Louisiana Public Service Commission v. Texas & N. O. R. Co., 284 U.S. 125, 131, 52 S.Ct. 74, 76, 76 L.Ed. 201, in which the court said: "The clause of the Constitution invoked is: 'No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another.' The specified limitations on the power of Congress were set to prevent preference as between states in respect of their ports or the entry and clearance of vessels. It does not forbid such discriminations as between ports. Congress, acting under the commerce clause, causes many things to be done that greatly benefit particular ports and which incidentally result to the disadvantage of other ports in the same or neighboring states." Moreover, in this case, the preference of which the intervenors complain is not given by a regulation of commerce but by a favorable geographic location.

The order of the Commission is sustained and the complaint of the plaintiff railroads, together with the complaints of the intervenors, are dismissed.

The findings of fact and the conclusions of law herein set forth are made a part of our more formal findings and conclusions of the same date.

Findings of Fact and Conclusions of Law.

The court adopts the following findings of fact and conclusions of law:

## Findings of Fact.

1. The Interstate Commerce Commission on July 7, 1948, filed its report and order in Docket No. 26712, and related cases, Rail-and-Barge Joint Rates, 270 I.C.C. 591, in which, after full investigation, it found that through routes and joint rates of common carriers by railroad and common carriers by water on the Mississippi and Warrior Rivers and their tributaries, were necessary and desirable in the public interest, and wherein reasonable differentials between all-rail rates and joint-barge and rail rates were prescribed.

2. Docket No. 26712 was an investigation on the Commission's own initiative into—

"the reasonableness and lawfulness otherwise of existing through routes and joint rates, rules, regulations, and practices for application by common carriers by railroad and by common carriers by water operating upon the Mississippi and Warrior Rivers and their tributaries; the reasonableness of existing minimum differentials between all-rail rates and corresponding rail-barge, barge-rail, and rail-barge-rail rates; the necessity, if any, for the establishment by the aforesaid common carriers by railroad and by water of additional through routes and joint rates, rules, regulations, and practices; and for the fixing of reasonable minimum differentials if any, between the corresponding all-rail rates and any such additional through routes and joint rates * * *"

Other proceedings were consolidated for hearing in the same investigation. The all-rail rates, as such, were not put in issue under the Commission's order of investigation.

3. Extensive hearings were held before an Examiner of the Commission, at which much testimony and other evidence in the form of exhibits were introduced, all of which has been presented to this court.

This evidence covered a wide range, and included testimony:

(a) With respect to cost of transportation service by rail, as compared to that by barge;

(b) With respect to results of traffic studies conducted by the railroads;

(c) With respect to the results of an investigation begun by Federal Barge Lines into costs of handling traffic on the lower Mississippi River, the upper Mississippi River, the Illinois Waterways and the Warrior Division;

(d) With respect to operating expenses, rents and taxes of the Mississippi Valley Barge Line;

(e) With respect to the age and carrying capacity of the barges, together with testimony showing modernization of equipment and terminals;

(f) With respect to stevedoring and cargo expenses in connection with transfer from barge to rail;

(g) With respect to the amount of traffic interchanged by the barge lines with the railroads;

(h) With respect to the sharp contraction of rail-barge traffic occurring during the war;

(i) With respect to the movement by barge southbound, compared with that northbound by barge, introduced by a considerable number of commercial witnesses;

(j) With respect to the inferiority of service by water as compared with service by rail, and showing that the barge-rail rates would not be used except at rates differentially lower than the corresponding all-rail rates.

4. The record before the Commission also contained a comprehensive analysis of the existing rail-barge rate structure, showing inconsistencies therein, and comprehensive traffic studies dealing with the effect of rates on the movement of traffic and differentials necessary to attract traffic to the rail-barge routes. There was considerable evidence introduced dealing with proposed differential rates which included studies as to the division to be allocated to participating barge carriers and rail carriers thereunder, and this testimony tended to show that the connecting rail carriers in the rail-barge route would receive substantially the same revenue as when said rail carriers participated with connecting rail lines in the handling of all-rail traffic. There was much evidence in the record developing savings to shippers using the barge service by reason of the use of differentials in the water portion of the through service, together with important evidence tending to show that the rail-barge service would not be used by shippers unless there were savings in the through charges in the form of differentials. There was also evidence with respect to competition of industries in the Mississippi Valley area with industries located coastwise, and the rail-barge rates needed to meet coastwise competition. Also, there was considerable testimony tending to show the illogical results in the Ex Parte 96 formula, and the effect of such formula upon shippers. Also there was evidence tending to show that through routes and joint rates between barge and rail lines, with accompanying differentials, were necessary and desirable in the public interest. Very comprehensive rate proposals of various water carriers and shippers were before the Commission and elaborate studies were presented by the Barge Lines respondents in which their costs of operations were measured against the existing rail rate structure, with a view to showing that upon the basis of such comparisons, the Barge Line respondents were able to provide differential rates at their own expense and thus effect savings to the shipping public. Cost figures also were presented by the railroads, and considered by the Commission's Cost Finding Section, and these, so far as the rail carriers were concerned, were based on system average figures for the entire body of railroad traffic in 1933-1934; testimony was also introduced showing that the actual rates maintained by the railroads on particular traffic studied are not based upon, or in proportion to the average system costs.

5. The hearings were concluded in March, 1943, and voluminous briefs were filed by the parties in interest.

6. An Examiner of the Commission on March 15, 1946, submitted a proposed report, making detailed findings of fact and recommendations, and upon consideration of this report and of the exceptions and replies thereto filed by interested parties, and following oral argument before the entire Commission on March 10 and 11, 1948, the Commission on July 7, 1948, issued its own report and order, making numerous subsidiary findings as well as the following ultimate findings:

"1. We find that the amounts shown in appendix A and Appendix B are justified as reasonable differentials to be deducted from the present first-class all-rail rates to and from the key points therein named to determine joint first-class rates applicable to the transportation of property by the barge lines and railroad carriers which are respondents in this proceeding, and that joint rates on other classes and columns should be determined by application of the usual percentages to such joint first-class rates.

"2. We find that joint commodity rates (not including commodities in bulk) from and to points referred to in appendix A and appendix B over lines of the aforesaid respondents should be established in amounts which would bear the same ratio to the all-rail commodity rates from and to the same points as that between the first-class all-rail rates and the first-class barge-and-rail rates from and to the same points, and that the differences between the all-rail and barge-and-rail commodity rates so established would be justified as differentials; provided, however, that this finding shall not affect the present barge-and-rail rates on sugar, in carloads, and shall not require the establishment of barge-and-rail commodity rate from New Orleans to any destination which shall be lower than the rate on the same commodity from Houston or Galveston to such destination, where the short-line rail distance to such destination from Houston or Galveston is not greater than the short-line rail distance to the same destination from the port of interchange in the barge-and-rail route from New Orleans.

"3. We find that the establishment of through routes and joint rates for the transportation of property subject to the differentials prescribed in findings 1 and 2 is necessary and desirable in the public interest.

"4. We find that as a reasonable condition under which such through routes shall be operated, and barge-and-rail traffic over such routes shall be subject to the same transit arrangements as those which are available under the corresponding all-rail rates from and to the same points."

These ultimate findings of fact are supported by findings of evidentiary facts by the Commission which support the ultimate findings.

7. On June 13, 1949, in the light of objections made by some of the intervening plaintiffs herein, the Commission issued a supplemental report, in which it made considerable revision in Finding No. 2 in the original report, to the benefit and advantage of said intervening plaintiffs.

8. The Commission's order issued on June 13, 1949 has been postponed from time to time so that the effective date is now March 31, 1950.

9. The findings of the Commission are supported by substantial evidence and are not arbitrary or unreasonable.

### Conclusions of Law.

The Court sets forth the following as its Conclusions of Law:

1. The court has jurisdiction of the parties and of the subject matter of this suit.

2. The Commission did not misinterpret the provisions of the statute in reaching its conclusions in this case, and its report and order of July 7, 1948 and June 13, 1949, as amended, are within the statutory authority of the Commission.

3. The findings of the Commission contained in its report and supplemental report are clearly sufficient to sustain its order, and such findings are supported by substantial evidence, and have a rational basis upon which to rest.

4. The injunction should be denied and the complaint and intervening complaints should be dismissed.