**STATE OF ILLINOIS, Illinois Commerce Commission, and Milwaukee Road Commuters' Association, Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission, and Chicago, Milwaukee, St. Paul & Pacific Railroad Company, Defendants.**

No. 56 C 681.

United States District Court
N. D. Illinois, E. D.
June 14, 1956.

Latham Castle, Atty. Gen., State of Illinois, Harry R. Begley, Sp. Asst. Atty. Gen., Chicago, Ill., for State of Illinois and Illinois Commerce Commission.

Tenney, Sherman, Bentley & Guthrie, Chicago, Ill., for Milwaukee Road Commuters' Assn.

Stanley N. Barnes, Asst. Atty. Gen., James E. Kilday, Maurice A. Fitzgerald, Attys., Dept. of Justice, Washington, D. C., Robert Tieken, U. S. Atty., Chicago, Ill., for United States of America.

Robert W. Ginnane, Gen. Counsel, Leo H. Pou, Associate Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

W. J. Quinn, T. H. Maguire, Edwin R. Eckersall, R. K. Merrill, Chicago, Ill., for Chicago, M., St. P. & P. R. Co.

Before SCHNACKENBERG, Circuit Judge, and SULLIVAN and LA BUY, District Judges.

SCHNACKENBERG, Circuit Judge.

This is an action to set aside and enjoin the enforcement of an order [1] of the Interstate Commerce Commission [2] authorizing the Chicago, Milwaukee, St. Paul and Pacific Railroad Company [3] to put into effect intrastate rates or fares for Chicago area suburban service higher than those authorized by the Illinois Commerce Commission.[4]

The Milwaukee Road by petition to the interstate commission requested an investigation under § 13(4) of the Interstate Commerce act [5] to determine wheth-

1. Entered March 2, 1956, based on report dated November 21, 1955, (297 I.C.C. 353).

2. Herein sometimes referred to as the "interstate commission".

3. Herein sometimes referred to as the "Milwaukee Road".

4. Herein sometimes referred to as the "state commission".

5. 49 U.S.C.A. § 13(4). "Whenever * * * the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes * * * any undue, unreasonable, or unjust discrimination against interstate

er intrastate suburban passenger rates approved by the state commission unjustly discriminated against interstate commerce. It asked that, if found so to discriminate, the rates be adjusted so as to remove the discrimination. The order of the interstate commission which we now consider is based upon its report of November 21, 1955, in which it refers to the Milwaukee Road as "respondent" and Milwaukee Road Commuters' Association as "protestant".

This report states that "on an out-of-pocket basis respondent shows a deficit of $724,511, while protestant shows an income of $9,701. For expenses other than the Union Station, protestant's lower figures are accounted for by the elimination of any allowance for depreciation and of certain accounts for maintenance of way not included in respondent's study before the Illinois commission." The report quotes the dollar amounts of depreciation which the interstate commission considers proper direct charges to the service and hence are out-of-pocket costs. It similarly considers certain maintenance of way expenses. The report points out that these depreciation and maintenance of way charges were not included in respondent's showing before the Illinois commission, but were included in its showing before the interstate commission. The report states that respondent's explanation for the prior omission was "its impression that, even without them, it had shown a considerable deficit from this service." The report adds: "This explains but does not excuse its incomplete showing before the Illinois commission."

The report finds:

"Summarizing, the total revenues from the passenger-carrying portion of the suburban service were $1,799,140, the out-of-pocket cost, not including non-payroll taxes or re-

turn, was $2,269,404, and the credit for nonrevenue passengers $164,226, resulting in a total out-of-pocket deficit of $306,038.

"If the fares were increased an average of 20 percent as in Commutation and Multiple Fares, Illinois and Wisconsin," [6] "supra, plus the additional increase to a minimum of 25 cents per trip, the increased revenue based on the 1954 movement would be about $383,000, which would eliminate the out-of-pocket deficit and result in a contribution to indirect costs and taxes, of approximately $77,000 annually."

The report also sets forth as follows:

"Protestant shows that the proposed fares are somewhat higher than certain of the fares of the dieselized lines of the Burlington and the Chicago, Rock Island and Pacific Railroad Company in the Chicago area, while respondent shows that they are somewhat lower than certain fares which the commissions have approved for the electric lines of the Illinois Central Railroad Company and the Chicago South Shore and South Bend Railroad in the Chicago area. However, we think that the comparison with the fares of the North Western is more persuasive, as, in the words of respondent's traffic witness, there is 'a strong similarity' between the suburban territory served by it and that served by the North Western, the two sets of fares, as approved by this and the Illinois commission, having formerly been on a parity."

Referring to the net railway operating income of respondent in 1954, the report states that it earned "from its freight operations $37,393,050, and suffered a deficit from its passenger opera-

---

or foreign commerce, which is forbidden and declared to be unlawful it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or prac-

tice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination."

6. 288 I.C.C. 15.

tions of $22,824,532, resulting in a net railway operating income of $14,568,518. To the extent that this suburban service fails to meet the out-of-pocket costs and make all the contribution that it reasonably can to respondent's indirect costs, it increases respondent's passenger deficit and results in an undue burden upon its freight operations, State and interstate."

The report also makes the following findings:

"1. That respondent's present suburban fares do not produce sufficient revenue to cover the out-of-pocket cost of the service and thus make no contribution toward its indirect costs nor to a return on investment.

"2. That respondent's present intrastate suburban fares, made or imposed by authority of the State of Illinois, cause and, unless increased to the extent herein set forth, will continue to cause undue, unreasonable, and unjust discrimination against interstate commerce, in violation of section 13(4) of the Interstate Commerce Act.

"3. That such undue, unreasonable, and unjust discrimination can and should be removed by establishing for such intrastate travel fares no lower than the bases set forth as prescribed in the appendix hereto.

"4. That such prescribed fares will be just and reasonable for the future, will produce substantial additional revenue, and are necessary so that the travel thereunder may make a fair contribution toward respondent's indirect costs and return on investment, and to enable it, under honest and efficient management, to provide adequate and efficient service at the lowest cost consistent with the furnishing of such service.

"5. That respondent's interstate suburban fares on the same bases as herein prescribed for intrastate application will be just and reasonable for the future."

1. While the interstate commission finds that the intrastate rates which it approves "would eliminate the out-of-pocket deficit and result in a contribution to indirect costs and taxes, of approximately $77,000 annually" and that those fares "will produce substantial additional revenue, and are necessary so that the travel thereunder may make a fair contribution toward respondent's indirect costs and return on investment," at no place does the commission make any findings as to what contribution from the intrastate suburban traffic would constitute a fair proportion of the railroad's total income. In fact the interstate commission makes no finding as to what the Milwaukee Road's total income was for the year in question, and likewise no finding as to what would be a fair proportionate share of total income of the road which the intrastate traffic now under consideration should contribute. These data are not found by the interstate commission either as specific findings in dollars or in any other form. Nor does the commission find that the revenue produced by the intrastate rates proposed by it will constitute not more than a fair proportion of respondent's total income, which finding was held sufficient in King v. United States, 344 U.S. 254, at page 275, 73 S.Ct. 259, at page 270, 97 L.Ed. 301.

In North Carolina v. United States, 325 U.S. 507, at page 516, 65 S.Ct. 1260, at page 1265, 89 L.Ed. 1760, the court said:

"But the question posed by the Commission's conclusion was whether the particular North Carolina railroads were obtaining from North Carolina's intra-state passenger rates their fair part of such funds as were required to enable these particular railroads to render adequate and efficient service. The Commission made no findings as to what contribution from intra-state traffic would constitute a fair proportion of the railroad's total income."

The report which we are considering asserts that intrastate traffic should make a larger contribution, but there is no find-

ing as to what contribution would be a fair proportion of the railroad's total income.

■ The rule is established that the interstate commission must make basic findings required to support its order. Florida v. United States, 282 U.S. 194, at page 215, 51 S.Ct. 119, at page 125, 75 L.Ed. 291; Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, at page 86, 51 S.Ct. 1, at page 5, 75 L.Ed. 221.

■ An order of the interstate commission is void unless supported by findings of the basic or quasi-jurisdictional facts conditioning its power. Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119; United States v. Baltimore & Ohio R. Co., 293 U.S. 454, at page 462, 55 S. Ct. 268, 79 L.Ed. 587; United States v. Chicago, M. St. Paul & P. R. Co., 294 U.S. 499, at page 504, 55 S.Ct. 462, 79 L.Ed. 1023.

In Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, at page 86, 51 S.Ct. 1, at page 6, the court said:

"The Commission's failure specifically to report the facts and give the reasons on which it concluded that under the circumstances the use of the average or group basis is justified leaves the parties in doubt as to a matter essential to the case, and imposes unnecessary work upon the courts called upon to consider the validity of the order. Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this."

See also 15 C.J.S., Commerce, § 145, p. 534.

■ The report of the interstate commission completely ignores that, in determining intrastate fares, a controlling inquiry is what contribution from the intrastate traffic would constitute a fair proportion of the railroad's income. In the case at bar it is not sufficient that the interstate commission found that the prescribed rates will "make a fair contribution toward respondent's indirect costs and return on investment". A fair proportion of a carrier's total income is not the same as a contribution to indirect costs and return on investment. Paying all of the costs of suburban service and, in addition, making a contribution to the other costs of the railroad, may well be more than contributing a fair proportion of Milwaukee Road's total income. Nor is it sufficient that the interstate commission found that, to the extent that the suburban service "fails to meet the out-of-pocket costs and make all the contribution that it reasonably can to respondent's indirect costs", it discriminates against its freight operations. This finding is no substitute for one as to what it should contribute as a fair proportionate share of the railroad's total income. Without the latter finding the order of the interstate commission cannot stand. This is not inconsistent with State of Illinois v. United States, D.C., 101 F.Supp. 36, 45, affirmed 342 U.S. 930, 72 S.Ct. 377, 96 L.Ed. 693. There was in that case a specific subsidiary finding [281 I.C.C. 552].

"The fares approved therein will yield a return after taxes of about 3.2 percent, and an average increase of about 20 percent or $1,300,000 per annum, which [we] *find to be the approximate measure of the revenue discrimination* against interstate commerce resulting from petitioner's present multiple and commutation fares." (Emphasis added.)

In that case the commission also found " 'That in connection with its minimum and round-trip suburban fares, petitioner has not shown any person-locality or *revenue discrimination against interstate commerce.*' " (Finding 2, 281 I.C.C. 552.) (Emphasis added.)

2. Even under the rationale of the interstate commission, it is somewhat difficult to ascertain from its report the precise obligation of the suburban service to which the intrastate fares, as fixed there-

by, are to contribute after meeting the out-of-pocket deficit.

■ The report at one place says that if the fares were increased an average of 20 per cent,[7] plus an additional increase to a minimum of 25 cents per trip, the increased revenue based on the year 1954 would eliminate the out-of-pocket deficit and result in *a contribution to indirect costs and taxes,* of approximately $77,000 annually. Based upon the same year, the report at another place says that to the extent that this service fails to meet the out-of-pocket cost and make *all the contribution that it reasonably can to respondent's indirect costs,* it increases the latter's passenger deficit and results in an undue burden on its freight operations. In finding 4 the report states that the prescribed fares are necessary so that the travel thereunder may make a *fair contribution toward respondent's indirect costs and return on investment.* If a *contribution* is to be made toward the satisfaction of an obligation, it is obvious that the extent of the obligation must be fixed; otherwise no one can know what the size of the contribution should be. We are here speaking of an involuntary contribution. The limitless requirements implicit in the parts just cited from the report are reminiscent of public fund raising campaigns which used as their slogan "Give till it hurts". That was a legitimate civic or patriotic appeal. However, we are here confronted with the imposition of an involuntary contribution being exacted by legal means. To be sustained, it must be based upon a finding of the extent of the obligation. It cannot be supported by a vague reference to an unascertained amount of "indirect costs and taxes" or what the suburban service can reasonably contribute to the Milwaukee Road's "indirect costs", or "a fair contribution toward respondent's indirect costs and return on investment".

3. We are confronted with the question of whether the evidence before the interstate commission supports its finding that the intrastate fares which it has prescribed will be just and reasonable for the future. This finding rests on an averment in the report that the comparison with the fares of the Chicago and North Western Railway Company is more persuasive, as, in the words of respondent's traffic witness, "there is a strong similarity between the suburban territory served by the Milwaukee Road and that served by the North Western, * * *".

The evidence of J. K. Pain, the traffic witness referred to, does not support this averment. He actually said that he believed there is a *difference* in the operation of the two roads and that he was not prepared on the subject of cost or expense, which was a little bit out of his line. He added that an endeavor was made to figure an increase on an equitable basis "that would recover our losses * * * and would be fair to the suburban passenger". When asked if Milwaukee Road's territory was "pretty similar" to North Western's, Mr. Pain asked, "Do you mean geographically or in operation or what?" When the examiner said that he was talking about the nature of the suburban community, the witness answered "Yes, you could probably say there is a strong similarity." Thereupon the attorney for the Milwaukee Road stated "we do not offer these North Western fares as a criteria (*sic*) as to what our fares should be".

There was no evidence offered showing similarity of equipment, service or operating conditions. On the other hand, the record shows that the lines are not comparable. The suburban North Western rates are based upon an operation of 72 steam locomotives and only 3 diesel locomotives as against a complete diesel operation on the Milwaukee. A comparison of the cost of the Milwaukee suburban operation under steam and diesel locomotives shows that the diesel operation costs less than steam. That a comparison cannot be properly made between

---

7. Actually they were increased about 21 per cent according to the counsel for the Milwaukee Road, or 28 per cent according to counsel for the protestants.

a steam operation and a diesel operation has been recognized by the interstate commission in a case in which North Western Chicago suburban fares were raised to their present level, and the commission stated, in referring to the analysis upon which its order was based, "The above analysis relates to an existing suburban operation for the year 1951 and obviously does not contemplate the cost of some other suburban operation such as might be encountered with diesel engines, gallery-type cars and Budd cars."[8] Moreover, the interstate commission has taken note of the fact that the Milwaukee division of the North Western carries no freight whatsoever and that the entire cost there must be borne by passenger traffic. Commutation Fares between Chicago and Wisconsin, 279 I.C.C. 773, 777–778.

The Milwaukee suburban operation is alleged to be much more comparable to the suburban operation of the Burlington and Rock Island than it is to the North Western operation. Those are the other two Chicago railroads using diesel locomotives in their suburban service. The commission, nevertheless, ignores that comparison, and holds, in effect, that the Illinois commission was wrong in giving weight to it. Instead, the proposed report applies the North Western formula without any evidence in the record of similarity of conditions necessary to make that formula applicable. The use of the North Western formula was not justified. Without sufficient evidence of comparability in operation, there is no ground for fixing the Milwaukee Road's fares at the North Western level, or for finding that the resulting fares are just and reasonable.

■■ We hold that the evidence does not support the finding of the interstate commission that the prescribed rates are just and reasonable. Nor can a carrier justify unreasonably high rates on intrastate business on the ground that only in that way is it able to meet losses on its interstate business. Dayton-Goose Creek

Ry. Co. v. United States, 263 U.S. 456, at page 483, 44 S.Ct. 169, 68 L.Ed. 388; Smyth v. Ames, 169 U.S. 466 at page 541, 18 S.Ct. 418, 42 L.Ed., 819 at page 847.

4. In the state commission proceeding, which was initiated by the Milwaukee Road, the latter showed in its exhibits that the depreciation of locomotives and coaches was not included in the out-of-pocket cost. Likewise, in its exhibits in that case it did not include in out-of-pocket expense certain maintenance of way accounts involving maintenance of facilities, such as roadbed, etc. The comments in the interstate commission's report, in regard to these items, show that they were by the Milwaukee Road deliberately removed from the consideration of the state commission. It follows that facts presented by Milwaukee Road to and relied upon by the interstate commission to support its finding as to an out-of-pocket suburban deficit, were not presented to nor relied on by the Milwaukee Road in the state commission proceeding. If different evidence is to be offered or a different basis of fares is to be urged before the interstate commission, the state commission should have been given a chance to fix fares on the same evidence and the same basis.

In North Carolina v. United States, 325 U.S. 507, at page 511, 65 S.Ct. 1260, at page 1263, 89 L.Ed. 1760, the court said:

"Since the enactment of § 13(4), as before its enactment, a state's power over intra-state rates is exclusive up to the point where its action would bring about the prejudice or discrimination prohibited by that section. When this point—not always easy to mark—is reached, and not until then, can the Interstate Commerce Commission nullify a state-prescribed rate."

■ Where a railroad seeks the fixing of higher intrastate rates by the interstate commission after failing in such en-

8. 288 I.C.C. 15, at 23.

deavor before a state commission, § 13 (4) does not contemplate that the state commission is to be considered only a way station in a journey to the interstate commission. In the instant case justification for the exercise of the federal power to nullify state rates does not clearly appear from the record before us.

Plaintiffs have made various other charges against the order of the interstate commission, which we do not find it necessary to decide, in view of the fact that our views herein expressed sufficiently decide the case now before us.

█ In this type of case we are not required, under rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., or otherwise, to make findings of fact. Despatch Shops v. Railroad Retirement Board, D. C., 60 F.Supp. 106, affirmed 2 Cir., 154 F.2d 417; In re Chicago, M., St. P. & P. R. Co. (Abrams v. Scandrett), 7 Cir., 138 F.2d 433.

For the reasons hereinbefore set forth, the order of the Interstate Commerce Commission is set aside and the subject matter thereof is remanded to that commission for further proceedings not inconsistent herewith. A permanent injunction will issue forthwith, as prayed.