90 So.2d 429 (1956)
Chester HUNTER et al., Plaintiffs-Appellant.
v.
John B. HUSSEY, Commissioner of Conservation, Defendant-Appellee-and-Appellant.
No. 4212.
Court of Appeal of Louisiana, First Circuit.
October 6, 1956.
Rehearing Denied November 26, 1956.
Writ of Certiorari Granted January 21, 1957.
*432 Locke, Locke & Purnell, Dallas, Tex., Blanchard, Goldstein, Walker & O'Quin, Shreveport, for plaintiff-appellant.
Winston B. Linam, Cook, Clark, Egan, Yancey & King, Shreveport, for defendant-appellant.
TATE, Judge.
This appeal was transferred to us by the Supreme Court on jurisdictional grounds. Hunter v. Hussey, 229 La. 151, 85 So.2d 246. Plaintiffs-appellants seek reversal of a district court judgment dismissing their suit to enjoin the enforcement of two orders of the Commissioner of Conservation which they contend are invalid for various reasons. The District Court held that plaintiffs had not been adversely affected by the challenged orders and were therefore without interest to bring this suit under LSA-R.S. 30:12.[1]
In general, plaintiffs herein represent a comparatively small group of producing interests (1½% of the total number) and royalty owners (5% of the total number) of the Delhi Oil Field, who feel that they are individually adversely affected by a proposed secondary recovery program, although said program will theoretically increase the total amount of oil and gas recovered from the entire field.
The Delhi Field is a large oil field situated in the northern part of the state and extends through an area of approximately 12½ miles from East to West and between one-half and two miles from north to south. The field consists of six or more separate reservoirs or pools of oil and gas found at different depths, the principal reservoir being the "Holt-Bryant," which underlies most of the area.
For the recited purpose of reducing waste of oil underground and increasing the quantity of oil recoverable from the field, 98½% of the operating owners in the field executed a "Unit Operating Agreement" which provided for the injection of water through certain down-dip wells (i. e., wells located low on structure where the oil is furtherest from the surface of the field) in order to flush or drive oil which might otherwise never be recovered into the up-dip portion of the field, where the up-dip wells might recover it.[2] Complementing this Unit Operating Agreement and the secondary recovery or pressure-maintenance program provided for therein was a "Unitization Agreement," signed by 95% of the royalty owners in the field, setting forth the participation of these royalty owners in the production from the field.
The producing and royalty interests executing these agreements (denoted in the briefs as the Sun Oil group) subsequently sought recognition by the Commissioner of their proposed field-wide secondary recovery program and also implementation insofar as within his legal powers. Plaintiffs seek herein to annul Commissioner's Orders 96-G, dated December 2nd, 1952, and 96-J, November 18, 1953, both issued after full notice and public hearing.
Plaintiffs-appellants own a large portion of the preferable up-dip properties in the Delhi Field. They refused to sign the *433 Unitization and Unit Operating Agreements, alleging that the extent of their participation in the entire production from the field under these agreements did not properly reflect the present and anticipated productive superiority of their up-dip properties. Plaintiffs contend that the orders complained of are invalid, because: (1) the Commissioner has no power to establish a mandatory program of secondary recovery by the water injection method and no power to transfer the allowable production of a low-structure well to a high-structure well; and (2) if the Louisiana Conservation Act, LSA-R.S. 30:2 et seq. does invest the Commissioner with such powers, that statute is unconstitutional because it fails to set forth sufficiently definite standards and conditions for the exercise of these powers and thus unconstitutionally attempts to vest legislative powers in an administrative officer.
At this point it may be well to observe that the Commissioner specifically disclaimed authority to institute a compulsory water injection secondary recovery program (Exhibit P-7, Hearing of July 30th, 1953). Further, while the Louisiana Conservation Act, LSA-R.S. 30:2 et seq., Act No. 157 of 1940, specifically empowers the Commissioner to require secondary recovery by gas re-cycling, LSA-R.S. 30:5, subd. B, he is authorized merely "to regulate" other secondary recovery methods including the introduction of water into producing formations, LSA-R.S. 30:4, subd. C(10). Legislative efforts to broaden the powers of the Commissioner in this regard have been unsuccessful.[3]
The Commissioner takes the position that the orders in question are merely permissive in character, effective only with respect to the operators who signed the Unitization and Unit Operating Agreements, and do not mandatorily require any unitized program of secondary recovery by the water injection method as to non-signing parties. The Commissioner urges that the orders represent a proper exercise of his constitutional and statutory power to prevent waste in accordance with the provisions of the Conservation Act. He further maintains that plaintiffs are without standing or interest to maintain their suit because they have not been adversely affected by the orders in question.
Considering first Order 96-G, we are in complete agreement with the District Court that this order did not adversely affect plaintiffs.
Order 96-G simply approved in principle the water injection methods set forth in the Unit Operating Agreement. As amended, the order on its face disclaimed any effect on the previously established method of determining allowables for production from each individual 40-acre drilling unit, and any purpose of authorizing the establishment of a unitized field-wide or pool-wide allowable. The order further provided that no person not a party to the Unit Operating or Unitization Agreements would become subject to such agreements providing for a field-wide water injection secondary recovery program; nor would any specific injection of water in any well be permitted until after full public notice and further hearing.
Especially in view of these limitations and qualifications, we find that none of plaintiffs' interests have been adversely affected by this order. Plaintiffs have the right to judicial review of any subsequent implementing orders adversely affecting them, which orders may only be issued after full notice and public hearing.[4]
We might add in passing that ample evidence supports the Commissioner's finding that the proposed water injection or *434 pressure maintenance program would increase the ultimate potential recovery of the field as a whole through the high-structure wells towards which the injection of water low on structure would drive the oil. In any event, for the reasons stated, we hold that plaintiffs have no standing to question the validity of Order 96-G.
Commissioner's Order 96-J issued on November 18, 1953, pursuant to hearing held July 30, 1953 (Exhibit P-7), upon an application by the Sun Oil Company requesting such changes and additions to the field rules "as will permit the granting of consolidated unit allowables or poolwide or fieldwide allowables for the Unitized Zone underlying the Delhi Unit * * * or as will permit the transfer of allowables among the wells completed in the Unitized Zone underlying the Delhi Unit." Plaintiffs-appellants were the principal opponents at said hearing.
Order 96-J permitted a redistribution of the "allowable" for oil production from the down-dip or low-structure wells to the up-dip or high-structure wells, in order that the less efficient producing wells might be closed or used for the injection of water. To compensate the owners for the loss of this "allowable" production, the up-dip wells were to be allowed to produce the closed-in wells' "allowable." Certain restrictions, based on the gas-oil ratio, percentage of water production, and the bottomhole pressure, were placed on the wells eligible to be both transferee and transferor wells.[5]
The Commissioner based his transfer of the allowables from the closed-in deficient wells thus used to conserve the production of the field as a whole, upon his statutory authority to prorate or distribute the allowable production.
LSA-R.S. 30:11, subd. B provides the statutory standard for allocation of allowables to the producing units in the pool:
"* * * The commissioner shall prorate *435 the allowable production among the producers in the pool on a reasonable basis so as to prevent or minimize avoidable drainage from each developed area which is not equalized by counter drainage, and so that each producer will have the opportunity to produce or receive his just and equitable share, subject to the reasonable necessities for the prevention of waste."
To complete the statutory standards, LSA-R.S. 30:9, subd. D, which defines the producer's "just and equitable share", provides as follows:
"Subject to the reasonable necessities for the prevention of waste, and to reasonable adjustment because of structural position, a producer's just and equitable share of the oil and gas in the pool, also referred to as a tract's just and equitable share, is that part of the authorized production of the pool, whether it be the total which could be produced without any restriction on the amount of production, or whether it be an amount less than that which the pool could produce if no restriction on amount were imposed, which is substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool, in so far as these amounts can be practically ascertained. To that end, the rules, regulations, and orders of the commissioner shall be such as will prevent or minimize reasonably avoidable net drainage from each developed area, that is, drainage not equalized by counter drainage, and will give to each producer the opportunity to use his just and equitable share of the reservoir energy. In determining each producer's just and equitable share of the production authorized for the pool, the commissioner is authorized to give due consideration to the productivity of the well or wells located thereon, as determined by flow tests, bottom hole pressure tests, or any other practical method of testing wells and producing structures, and to consider other factors and geological and engineering tests and data as may be determined by the commissioner to be pertinent or relevant to ascertaining each producer's just and equitable share of the production and reservoir energy of the field or pool."
The Commissioner's transfer of allowables was based upon a finding that thus the inefficient well, closed in so that the field as a whole would produce more oil and gas and for a longer period of time, would receive its just and equitable share of the oil and gas from the field.[6]
Plaintiffs strongly contend that the statute above-cited confers no authority upon the Commissioner to arbitrarily assign the alowable of one well to another well, for however worthy a purpose; and that by permitting the Sun Oil up-dip wells to produce (with the transferred allowable) twice what plaintiffs' up-dip wells are allowed, plaintiffs are aggrieved since the oil available to the up-dip wells will be depleted sooner and with the Sun Oil group receiving a greater share than plaintiffs. For of course "The law does not imply a power in the regulatory bodies or the courts to take the property of one party and give it to another in order to effectuate a just result," *436 Republic Natural Gas Company v. Baker, 10 Cir., 197 F.2d 647, at page 650.
We think the statutory authority is broad enough to support the authority claimed. The inefficient wells were closed in voluntarily through application for approval by the Commissioner (rather than by adversary order after notice and hearing, e. g., LSA-R.S. 30:4, subd. C(3), (4)), and in order to conserve and extend production of the field as a whole and prevent "waste", LSA-R.S. 30:3 (1) (a), prohibited by the Conservation Act, LSA-R.S. 30:2, and which prohibition it is the duty of the Commissioner to enforce (within his statutory authority), LSA-R.S. 30:4, subd. A. The finding that such closed-in wells would not otherwise "receive" their "just and equitable share" of the field's production is supported by competent evidence in the hearings and the trial on the merits; and such transfer of allowables is therefore not in itself objectionable.
Insofar as Order 96-J had no effect other than to permit the transfer of allowables from deficient down-dip wells to efficient up-dip wells to rectify inequities inherent in the water injection program affecting only those parties who had consented thereto, it would not be invalid.
Likewise, we cannot sustain plaintiffs' attack upon such statute as an unconstitutional delegation of authority to the Commissioner. In upholding the constitutionality of the delegation by the legislature to the Commissioner of the power to determine compulsory production units, the Supreme Court remarked, reciting earlier jurisprudence and a host of supporting citations: "It is recognized consistently that a statute which delegates to an administrative officer or board or commission the authority to find the facts upon which the law is to be applied is not a delegation of either the judicial or the legislative power," Hunter Company v. McHugh, 202 La. 97, 11 So.2d 495, at page 500. Cf. O'Meara v. Union Oil Company, 212 La. 745, 33 So.2d 506, at page 509 for practical reasons in justification of this legislative policy.
Of course such legislative delegation may be invalid as an unconstitutional delegation of legislative powers if the legislature fails to provide the standard (or "law") with sufficient specificity or limitations, so that determinations thereunder are not of facts following which the legislative standard may be applied to the facts so found, but instead the permissible action taken is any deemed advisable by the administrative agency or official to accomplish merely the general aims furnished by the legislature. City of Baton Rouge v. Shilg, 198 La. 994, 5 So.2d 312; State v. Maitrejean, 193 La. 824, 825, 192 So. 361; State v. Billot, 154 La. 402, 97 So. 589.
But herein, as in the Hunter case, the delegation by the legislature of authority was accompanied by certain specific standards. The allowables shall be prorated by the Commissioner so that each producer will have the opportunity "to produce or receive his just and equitable share" of the oil or gas in the pool, LSA-R.S. 30.11, subd. B, which is defined as "substantially in the proportion that the quantity of recoverable oil and gas in the developed area of his tract or tracts in the pool bears to the recoverable oil and gas in the total developed area of the pool," LSA-R.S. 30:9, subd. D. Further, such proration must be made "so as to prevent or minimize avoidable drainage from each developed area which is not equalized by counter drainage," LSA-R.S. 30:11, subd. B.
But the counter-face to, the corollary of, this doctrine is that in order to be valid, the actions of administrative agencies must be taken in accordance with the legislative grant of authority. The power of the administrative officer or agency to take valid action is conditioned upon first establishing that the action to be taken falls within the legislative grant of authority.
*437 "An administrative officer exercising delegated powers must comply with the statutory requirements for the exercise of such powers, and if the making of a finding is a condition precedent to an act, the fulfillment of that condition should appear in the record of the act, or the act is void. However, the necessity for a finding to sustain an administrative order does not rest wholly upon a statutory requirement of a finding. Apart from statutes requiring findings, an order of an administrative body cannot be sustained unless supported by findings of the basic or quasi-jurisdictional facts conditioning this power," 42 Am.Jur. 494, Verbo "Public Administrative Bodies", Section 149.
"It is generally required, either on constitutional grounds or under statutes so providing, or even apart from statute, that an administrative body or officer must make findings of fact on the issues presented to it in an adjudicatory proceeding. * * * [T]he action or determination is void unless it is supported by findings of the basic or quasi-jurisdictional facts conditioning its power", 73 C.J.S., Verbo, Public Administrative Bodies and Procedure, § 139, p. 464.
In the present instance, plaintiffs appeared at the hearing to object to the reallocation of allowables proposed therein by the Sun Oil group. The issue tendered was thus that the proposed reallocation threatened the proportionate share of the field's production to be received by plaintiffs' up-dip wells, adjacent to or in the same area as the transferor wells which under the proposed order could produce 100% more oil per well daily than plaintiffs' neighboring up-dip wells.
Despite these objections, the Commissioner's sole finding anent these objections was, Finding 6, Order 96-J:
"A more efficient operation of the pressure maintenance program in the Holt-Bryant-May Equivalent Reservoir can be accomplished with less reservoir voidage and better conservation of reservoir energy by producing from the more efficient wells the amount of oil allowed and allotted to wells having high gas/oil ratios or producing excessive amounts of water, or which are otherwise less efficient."
Thus the finding is that the proposed reallocation allowables will permit a "more efficient operation" of the fieldi. e., will prevent "waste" in its broadest sense. But the Commissioner's authority to prorate or distribute allowables under LSA-R.S. 30:11, subd. B is given to him, not to prevent waste, however worthy such purpose is. The legislative standard which he must apply in using the power delegated to him by the Legislature in LSA-R.S. 30:11, subd. B in prorating allowables among the individual producers is that such proration must be on a reasonable basis so as to minimize drainage "which is not equalized by counter drainage" and must deprive no producer of his just and equitable share of the production.[7]
The order is bare of a finding that the reallocation of allowables would not cause the up-dip wells of the petitioners, who appeared to object to such reallocation on such account, drainage "not equalized by counter drainage" or a loss of their just and equitable share of the production. These are the conditions which must be found to exist before the Commissioner's power to prorate allowables arises, as over the protest of parties who allege that such proration will occasion them net drainage *438 or a loss of their just and equitable share of the production of the field. In the absence of this basic jurisdictional finding, the Commissioner's order is not valid.
Thus in United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 55 S.Ct. 268, 272, 79 L.Ed. 587, the question was whether the court would sustain the order of Interstate Commerce Commission requiring railroads to use power-operated reverse gear, rather than the manually-operated gear previously used by many lines. The Commission was authorized by the Boiler Inspection Act, 45 U.S.C.A. §§ 23, 28, 29, to order (after hearing) locomotives equipped with safety devices in order to eliminate "`unnecessary peril to life or limb.'" The Commission's findings went so far as to say: "`* * * we conclude and find that the safety of employees and travellers on railroads requires that all steam locomotives * * * be equipped with a suitable type of power-operated reverse gear.'"
Nevertheless the United States Supreme Court held the Commission's order invalid as follows, 293 U.S. 463-464, 55 S.Ct. 268, at page 272:
"The primary question of fact presented for determination was, as the report of the Commission states, `whether the use of locomotives equipped with hand reverse gear, as compared with power reverse gear, causes unnecessary peril to life or limb.' The report discusses at some length the alleged advantages and disadvantages of the two classes of reverse gear and the expense which the proposed change would entail, and concludes with `findings' that to a certain extent the change should be made. But whether the use of any or all types of steam locomotives `equipped with hand reverse gear as compared with power reverse gear causes unnecessary peril to life or limb' is left entirely to inference. This complete absence of `the basic or essential findings required to support the Commission's order' renders it void." (Italics ours.)
This Court has reviewed the entire voluminous record of detailed, technical evidence and exhibits.[8]
This effort has convinced us of the wisdom of the judicial doctrine that an order is invalid when "the basic or essential findings to support that part of the order are lacking", Howard Hall Co., Inc., v. United States, 315 U.S. 495, 62 S.Ct. 732, 734, 86 L.Ed. 986. See also: United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; Atchison T. & S. F. Ry. Company v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382; United States v. Chicago M., St. P. & R. Company, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; United States v. Baltimore & Ohio R. Company, supra; Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291; Beaumont, S. L. & W. R. Co. v. United States, 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221; for cases invalidating administrative orders for failure of the administrative agency to make basic or jurisdictional findings.
In United States v. Carolina Freight Carriers Corporation, 315 U.S. 475, 62 S.Ct. 722, an order restricting a carrier to *439 certain commodities and between certain points was held void. The Court stated the "precise grounds" for such determination "are not clear. It is impossible to say that the statutory standards * * * were applied to the facts in this record. Hence * * * the defect is not merely one of the absence of a `suitably complete statement' of the reasons for the decision; it is the `lack of the basic or essential findings required to support the Commission's order'", 315 U.S. 488-489, 62 S.Ct. 729. (Italics ours.)
The Court then continued, in a comprehensive explanation of the reasons why the administrative findings of the jurisdictional condition provided by the legislature are essential to judicial review of the administrative order:
"Congress has made a grant of rights to carriers such as appellee. Congress has prescribed statutory standards pursuant to which those rights are to be determined. Neither the Court nor the Commission is warranted in departing from those standards because of any doubts which may exist as to the wisdom of following the course which Congress has chosen. Congress has also provided for judicial review as an additional assurance that its policies be executed. That review certainly entails an inquiry as to whether the Commission has employed those statutory standards. If that inquiry is halted at the threshold by reason of the fact that it is impossible to say whether or not those standards have been applied, then that review has indeed become a perfunctory process. * * * An insistence upon the findings which Congress has made basic and essential to the Commission's action is no intrusion into the administrative domain. * * * Only when the statutory standards have been applied can the question be reached as to whether the findings are supported by evidence."
Thus, in the present instance, the main thrust of the testimony of Sun Oil Engineer Paul Fletcher, sole witness in the hearing of July 30th, 1953 (P-7), as a result of which Order 96-J issued, is that ultimate recovery of oil and greater efficiency in operations would be enhanced by shutting in or restricting production of certain wells of high gas-oil ratio or producing waterthat is, wells which in his opinion dispersed an excessive amount of the field's water or gas drive in proportion to the oil recovered. His testimony suitably supports a finding that the transferred allowable schedule provides a method to enable deficient wells, shut in or restricted, to "receive" their just and equitable share of production.
But the testimony of this sole witness just glancingly refers to the legal and factual issues tendered by the objection of plaintiffsthat such reallocation will deprive their up-dip wells of their just and equitable share of production.
The restriction preventing any transferor well from producing more than 100% of the allowable of other wells was designed to afford "greater protection to the nonunitized fields" than allowing a lump sum unit allowable which "would have permitted the unlimited production from any individual wells and the unlimited closing of other wells" which were voluntarily unitized, P-7, p. 112. Fletcher stated that, with the limitations, devised, there should not as a general rule be any material drainage of any wells neighboring these to which the allowable was transferred, and said wells should be able to recover all (or more than) the oil otherwise recoverable, taking into consideration the additional pressure or energy providing counter-drainage and made possible by the closing of the deficient wells, P-7, pp. 121-126, 135-138. But the testimony of this witness implies and sometimes frankly admits that whether additional production in neighboring wells would cause drainage as to a particular well depended upon the structural position, *440 location, and production of the particular wells concerned.[9]
The testimony of the many expert witnesses at the trial in the District Court concurs with this testimony. Defendants' witnesses emphasize the lack of possible net drainage; plaintiffs' witnesses emphasize that if production of wells close to plaintiffs' up-dip wells is allowed to double by transfer of allowables, ultimate recovery from plaintiffs' up-dip wells would be decreased because of the more rapid encroachment of water in the vicinity of said slower-producing wells; also because formation of a secondary gascap locally would be induced.
In the absence of a finding by the Commissioner, we are unable to determine whether in adopting limitations upon the transfer of allowables (to be made subsequently upon ex parte order, without notice and hearing), the Commissioner applied the standard provided by the legislature, which was: that in pro-rating allowable production, the Commissioner must not deprive any producer of his just and equitable share of production, nor cause net drainage to any developed tract. It is not within the province of the courts to review the specialized evidence and to make such finding in the failure of the administrator's order to include a finding of the basic facts conditioning the power of the administrator to issue the order.
Some argument is made by the Commissioner that plaintiffs have failed to exhaust their administrative remedies, a condition precedent to judicial review, LSA-R.S. 30:12. The Supreme Court held in Roussel v. Digby, 222 La. 779, 64 So.2d 1, that a plaintiff has exhausted his administrative remedies by appearing before the Commissioner and requesting certain relief not afforded him; he is not required to ask that the order be amended or to apply for reconsideration. It appears to us that, likewise, plaintiffs herein have exhausted their administrative remedies by appearing before the Commissioner and opposing certain proposed action, subsequently taken despite their protest. In the absence of legislative or administrative regulation, they are not required then to apply for rehearings or reconsiderations of the original order and any modifications thereof secured as "the administrative remedy would never become exhausted. We do not believe that it was ever the intention of the lawmakers to place such an undue burden upon aggrieved parties", 64 So.2d 2.
The Commissioner further urges that the evidence reflects that plaintiffs have as yet suffered no injury from the reallocation of allowables and are therefore without right to judicial review. Indeed, we believe the expert opinion at the trial below indicates that the Commissioner has exercised most sparingly his powers of reallocating allowables. The allowables from only 7-10 deficient transferor wells have been distributed over 63-65 transferee wells spread across the field, increasing the allowable of no transferee well more than 7-12 barrels daily over the normal allowable (66 barrels daily) of individual wells in the field. We do not believe the evidence indicates serious question that such conservative administration, preceded by such careful consideration of the consequences of such transfers of allowables, could successfully prevent plaintiffs' wells from suffering net drainage.
Appellants reply that the very care with which the Commissioner has administered the program and avoided full use of the *441 power claimed to reallocate allowables, indicates the potential harm to which plaintiffs' up-dip wells might be occasioned by a less careful transfer of allowables, nevertheless within the range and scope of the transfer power claimed by Order 96-J. They urge that they are entitled in specific terms of the Conservation Act to judicial reviews of the Commissioner's orders when `adversely affected * * * by an act done or threatened thereunder," LSA-R.S. 30:12. (Italics ours.)
However, simply stated, plaintiffs are adversely affected by an order which failed to include a finding of the jurisdictional fact upon which its issuance is conditioned by the legislature, and the issuance of which order plaintiffs opposed in the preceding hearing on the ground that the Commissioner had no power to issue same. For the order is not valid; and in this instance does not negative the "net drainage" and loss of their "just and equitable share" of production which plaintiffs claim its issuance will cause them, and which jurisdictional facts were requisites to the validity of the order.
Having failed to make such findings, Commissioner's Order 96-J must be avoided and annulled. However, the case will be remanded in order that the Commissioner may have an opportunity to make the necessary findings based on the present record or subsequent hearings, and/or to provide such additional limitations upon the transfer of allowables as will justify the validity of the order under the conditions provided by the legislature for its issuance.
Certain incidental matters should be noted.
Plaintiffs complained that under Order 96-J, the Commissioner had treated two separate pools as one, and that the Mengel Sand reservoir had been closed in improperly. In a "Motion to Remand", the Commissioner alleges that both of these questions are now moot in view of certain modifications of Order 96-J by subsequent order and prays that the cause be remanded to receive evidence of these facts. This motion is granted.
Plaintiffs complain of Paragraph 3 of Order 96-J, which permits the Commissioner (after hearing) to require non-consenting operators of efficient (or up-dip) wells to produce transferred allowables for inefficient or closed-in wells. Plaintiffs have not been adversely affected by this portion of Order 96-J. No one has applied to the Commissioner for assignment of such a transferable allowable to efficient wells owned by plaintiffs. Such transfer further, under the Order, cannot be made until after a public hearing with due notice to plaintiffs. Should the occasion arise when plaintiffs are adversely affected by attempted exercise of the powers claimed, they have the opportunity to oppose same administratively and the right to judicial review if ever adversely affected.
As to plaintiffs' request for relief from the alleged failure of the Sun Oil group to maintain separate storage batteries or gauges for each well, this relief was never requested from the Commissioner. Plaintiffs have not exhausted their administrative remedies, and their demand in this regard must be dismissed. LSA-R.S. 30:12; O'Meara v. Union Oil Company, 212 La. 745, 33 So.2d 506.
For the above and foregoing reasons, the judgment of the District Court dismissing plaintiffs' suit insofar as it sought to annul Order 96-G of the Commissioner of Conservation, dated December 2, 1952, amended February 16, 1953, is hereby affirmed. But the judgment of the District Court dismissing plaintiffs' demand to avoid and annul Order 96-J of the Commissioner of Conservation, dated November 18, 1953, is hereby reversed, and this cause is remanded to the Commissioner of Conservation for proceedings not inconsistent with the views expressed herein.
Plaintiffs are condemned to pay one-half of the costs of these proceedings; under LSA-R.S. 13:4521, defendant shall be required *442 to pay only one-half the stenographic charges for the transcription of testimony, as a public agency of the State of Louisiana.
Affirmed in part; reversed in part; and remanded to the Commissioner of Conservation.
NOTES
[1] LSA-R.S. 30:12. "An interested person adversely affected by * * * a rule, regulation, or order made by the commissioner hereunder, or by an act done or threatened thereunder, and who has exhausted his administrative remedy, may obtain court review and seek relief by a suit for an injunction against the commissioner as defendant."
[2] The record shows that oil in a reservoir or pool underneath the ground will not migrate through the formation and up to the well bore drilled deep into the earth in the absence of some expulsive force with sufficient energy to cause this movement of oil. If the expulsive force in a reservoir is dissipated too rapidly, part of the oil which could have been produced by proper and conservative use of this reservoir energy will be left underground and never recovered. Where the expulsive force in a reservoir is not adequate or in only partially effective under normal operating conditions, additional oil recovery can be effectuated by adding an extraneous force or energy to supplement the expulsive force. This is what is known as secondary recovery.
[3] S.B. 179, 390, 1950; S.B. 97, 1952; S.B. 165 and H.B. 579, 1954.
[4] Plaintiffs did not oppose and do not seek to annul Order No. 96-H issued on May 28, 1953, which after public hearing approved a specific system of water injection next to several of plaintiffs' down-dip wells along the southern edge of the field, which presumably affected such individual wells, although production from the field as a whole may have been increased.
[5] The salient portion of this contested order is:

"2. In order that the pressure maintenance program may be conducted in accordance with better engineering practices and oil may be produced in a more efficient manner with less dissipation of reservoir energy, all or a portion of the allowable production of oil from a deficient well or wells in the Holt-Bryant-May Equivalent Reservoir may be transferred to and produced from an efficient well or wells in the same reservoir in the following manner and with the following limitations:
"a) Application for permission to transfer allowables shall be made in writing to the Commissioner of Conservation specifying the wells from which the allowable is to be transferred and the amount of allowable to be transferred from each well, the wells to which such transferred allowable is to be assigned and the amount of transferred allowable which is to be produced from each well, and a statement of the reason for requesting such transfer.
"b) Permission to transfer allowables may be granted by the Commissioner of Conservation without a public hearing if he is convinced that such transfer of allowable is conducive to a more efficient operation of the pressure maintenance project, provided that the requirements hereinafter specified are fulfilled.
"c) No transfer shall be made from any well except where the transferor well is, at the time of transfer, (1) producing with a gas/oil ratio greater than 1000:1, (2) producing water, (3) closed in for testing the well or reservoir or for remedial work, pressure regulation or control of sweep to achieve efficiency of production, pressure maintenance or secondary recovery operations, or (4) for such other reasons as the Commissioner of Conservation may deem expedient for more efficient operation of the pressure maintenance program.
"d) No well shall be eligible to receive or to produce a transferred allowable when:
"(1) it produces more than twenty-five per cent (25%) water; or
"(2) its gas/oil ratio exceeds 1000:1; or
"(3) its bottomhole pressure is more than ten per cent (10%) below the average bottomhole pressure in the reservoir.
"(4) In no event shall the production from any well receiving a transferred allowable exceed its individually assigned allowable by more than one hundred per cent (100%)."
[6] Order

* * * * *
4. The right to transfer allowables as herein established is granted for the purpose of permitting a more efficient operation of the pressure maintenance program, but in order to comply with LSA-R.S. 30:11 which requires that each developed tract be permitted to "produce or receive" its just and equitable share of the oil and gas from the reservoir, it is ordered that, when any allowable shall be transferred under the provisions hereof and the oil be produced from another well, the oil produced pursuant to the transferred allowable shall be allocated to the producing unit or developed tract on which the transferer well is located, the same as if such oil had been produced from the transferor well.
[7] The first condition is an additional expression of the prohibition found in LSA-R.S. 30:9, subd. A (2), which provides:

"A. Whether or not the total production from a pool be limited or prorated, no rule, regulation, or order of the commissioner shall in terms or effect:
* * * * *
"(2) Occasion net drainage from a tract unless there be drilled and operated upon the tract a well or wells in addition to the well or wells thereon that can without waste produce the tract's just and equitable share of the production of the pool."
[8] The chief testimony relating to the transfer of allowables is found as follows: Exhibit P-7, testimony of Paul Fletcher, Sun Oil Petroleum Engineer (hearing of July 30th), pp. 1-153; and in the transcript of the trial in District Court: N. A. Tinker, petroleum engineer called by plaintiffs, Tr. 107-111, 117-119; Paul Montgomery, petroleum engineer for plaintiffs, Tr. 179-194, chiefly first pages; James Cunningham, petroleum engineer for plaintiffs, Tr. 229-236, 421-2, 244-5; Paul B. Fletcher, defendant's petroleum engineer, Tr. 303-325, 335-348; Paul McDonald, petroleum engineer for defendant, Tr. 351; Frank Speller, Jr. petroleum engineer for defendant, Tr. 362-364, 367-370; T. M. Winfield, Chief Engineer for Department of Conservation, Tr. 373-8; Martin Farrell, Tr. 379; Stipulation at Tr. 384 of testimony of three petroleum engineers.
[9] See testimony, inter alia, in Exhibit P-7: "Q. In order to consider the proposition of drainage regularly and completely, you would have to consider the situation of production of all the surrounding wells, would you not?A. That's right; in that area." pp. 135-6; "I wouldn't propose that" (as to transferring the full 100% allowable to a particular well), p. 118, 124; his remark that a "prudent operator" would not "concentrate withdrawals" so as to impair a non-unitized well, p. 136.